Robert NELSEN, Plaintiff,

v.

RESEARCH CORPORATION OF The UNIVERSITY OF HAWAII, Defendant.

Civ. No. 89–00738BMK.

United States District Court, D. Hawaii.

Oct. 22, 1992.

Douglas M. Fryer, Newell D. Smith, Mikkelborg, Broz, Wells & Fryer, Seattle, Wash., Michael J. McGuigan, Reinwald, O'Connor, Marrack, Hoskins & Playdon, Honolulu, Hawaii, for plaintiff.

Samuel A. Keesal, Albert E. Peacock, Keesal, Young & Logan, Long Beach, Cal., David A. Nakashima, Alston, Hunt, Floyd & Ing, Honolulu, Hawaii, for defendant.

## AMENDED FINDINGS OF FACT and CONCLUSIONS OF LAW

KURREN, United States Magistrate Judge.

### I. INTRODUCTION

This is an action brought under the Jones Act, 46 U.S.C.App. § 688, and general maritime law to recover for psychological injuries sustained by plaintiff Robert Nelsen ("Nelsen") in 1986 and 1987 while Nelsen served as captain of an oceanographic research vessel, the Kila.

The jury-waived trial commenced on April 9, 1992, and continued thereafter until April 23, 1992. After having carefully considered the evidence and the applicable law, the court now files its decision embracing the findings of fact and conclusions of law required by Fed.R.Civ.P. 52.

## II. FACTS

### A. *The Parties*

Nelsen was employed in June 1984 by defendant Research Corporation of the University of Hawaii ("RCUH") to be master of the Kila. He continued in that capacity until discharged effective June 23, 1987.

Prior to his employment with RCUH, Nelsen had extensive experience as a commercial fisherman beginning when he was a teenager. He obtained his master's license in 1982, 1,000 ton limit.

RCUH is a Hawaii corporation. Its purpose is to operate several marine research vessels for the University of Hawaii. One of these vessels is the Kila. RCUH operated out of its Marine Center in Honolulu. Beginning in 1985, Captain James W. Coste ("Coste") was in charge of the Marine Center as marine superintendent. The Kila is a 103 foot, 192 gross ton research vessel built in 1977. The Kila was at all times material owned by the United States Navy and under bareboat charter to RCUH.

### B. *The Overheating Incident*

On September 27, 1986, the Kila left the port of Honolulu on a research cruise scheduled to take place in waters off the island of Hawaii. Prior to leaving port, the Kila had undergone repairs that included removal of the insulation, or lagging, surrounding its exhaust stacks. Before the lagging could be replaced, Coste ordered the Kila out on cruise, despite recommendations to the contrary by the port captain and the head machinist.

As the Kila proceeded through the harbor and out the harbor entrance, the heat from the exposed exhaust mufflers and exhaust stacks rapidly built up in the engine room. Within 15 minutes of leaving the dock, the engine room ladder and walls became too hot to touch, and the hydraulic lines, electrical wiring and engine control lines in close proximity to the exhaust stacks were in danger of melting. As a result, the engine room cable controls from the bridge and the aft control station were so damaged that controls to one engine completely jammed and controls to the other engine became very stiff. Within 20–30 minutes of leaving dock, Nelsen had to shut down one engine, turn the Kila around and return to port.

### C. *The Aft Station Control Problems*

The aft control cables damaged during the overheating incident were replaced with controls that did not work effectively. The new controls had the effect of being very stiff and jamming in gear. There was also the problem that when the gear was put in neutral quite often the prop would still be turning.

Nelsen frequently complained orally and in writing that the replacement cables would stick and that they were dangerous to scuba divers who would be working in the water around the Kila in connection with certain research activities involving the Kila.

However, although problems with the replacement cables persisted, at no time while Nelsen was master of the Kila was there any personal injury or death to any scuba diver, crew member or anyone else as a result of the replacement control cables.

### D. *The Flooding Incident*

On January 27, 1987, the Kila departed for a 3-day cruise to deploy fish aggregation device buoys off the islands of Molokai, Maui and Hawaii. At approximately 8:00 p.m. on January 27, 1987, when the Kila was about three miles off the southeast coast of Maui, crew member Chip Millard ("Millard") was making his routine check of the engine room during his watch when he noticed water coming into the engine room bilge from an uncovered 8-inch stand pipe which was connected to the shaft alleys. The engine room had approximately 2–3 feet of water. Millard discover-

ed that the reason that the water had come in that high was that an automatic switch in the stand pipe had failed to activate. Millard activated the switch which caused the main bilge pump, which had been valved over to pump out the shaft alleys, to come on line. The pump was not able to keep up with the inflow of water. Because of the lack of a bilge alarm, the crew had no prior warning of the problem. Soon after discovering the flooding, Millard notified Nelsen and the crew members of the problem.

Because the main bilge pump was not keeping up with the flooding, Nelsen and the crew attempted to get a portable emergency pump working. However, it was discovered that the pump was frozen, and it would not turn over. When it became apparent that the portable emergency pump was not going to work, a fire pump was jury-rigged to function as a bilge pump, but the intake screen kept clogging with debris from the bilges. Within forty minutes to an hour after the flooding was discovered, the water level in the engine room bilge began to decrease. Within an hour and twenty-five minutes after the flooding was discovered, the engine room bilge was nearly dry. Thereafter, the bilge pump was able to keep pace with the incoming water with only intermittent use of the emergency fire pump.

After being informed of the flooding, Nelsen came below and began directing emergency procedures. However, Nelsen also had to run the bridge at the same time. Because the vessel intercom was not functional, Nelsen had to make many trips between the bridge and engine room.

After the flooding was discovered, Nelsen changed course for Maalaea on the island of Maui. The Kila arrived at Maalaea and anchored off the Coast Guard station there at approximately 1:20 a.m. on January 28, 1987.

After anchoring at Maalaea Bay, Nelsen returned to his bunk. At that point in time, Nelsen experienced what he thought was a heart attack, including profuse sweating, nausea, a pounding heart and chest pain. The symptoms complained of started when Nelsen was under stress during the flooding incident and running up and down the stairs from the bridge to the engine room.

Between the flooding incident and Nelsen's employment termination in May 1987, none of the crew of the Kila or any of the personnel at the Marine Center noticed any change in Nelsen's character, personality or demeanor.

### E. Nelsen's Discharge From Employment

Between December 1986 and May 1987, Nelsen became involved in the sale of the research vessel Kana Keoki, which was owned by the University of Hawaii. Nelsen helped solicit bids for the Kana Keoki in Seattle, Washington. At the same time, he prepared a business plan under the name "First American Seafood" and began making plans to purchase the Kana Keoki himself. When Nelsen's dealings concerning the Kana Keoki were discovered by RCUH, Nelsen was suspended and later discharged.

In June 1987, Nelsen instituted a grievance proceeding seeking reinstatement as the master of the Kila. Throughout the grievance proceeding, Nelsen contended that he was a "whistle-blower" and had been harassed and ultimately fired for making complaints about the safety of the Kila, including, but not limited to the overheating, cable control and flooding problems.

On October 19, 1987, the grievance hearing officer, Stanley Ling ("Ling"), rendered a decision concerning the grievance proceeding. In his decision, Ling concluded that Nelsen's conduct with regard to the Kana Keoki constituted a conflict of interest because of Nelsen's employment with RCUH. Ling also found that discipline was warranted, including suspension with no back pay or other compensation. He further found that Nelsen should receive counselling concerning conflicts of interest. He also found that there was insufficient evidence to support Nelsen's contention that he was terminated because he was a "whistle-blower" or had complained about

safety conditions aboard the Kila. Ling concluded, however, that discharge was too severe a punishment.

On October 30, 1987, the director of RCUH notified Nelsen and his attorney that the recommendations of the hearing officer with respect to reinstatement would not be followed and that Nelsen would not be rehired. Nelsen did not file a timely appeal of this decision.

During the course of the grievance proceeding, the State Ethics Commission also filed charges against Nelsen related to the sale of the Kana Keoki. There has been no determination made with respect to those charges.

### F. *Nelsen's Medical Treatment*

Following the flooding incident, Nelsen visited a succession of cardiologists concerning the symptoms he experienced soon after the flooding incident. Prior to seeing his primary treating psychiatrists, Nelsen was diagnosed with single vessel coronary artery disease involving a 70% to 80% blockage and was found to be suffering from probable episodes of angina pectoris. Although Nelsen denied that he had any heart disease or heart symptoms similar to those experienced during the flooding incident, his medical records indicate a prior history of chest pain and symptoms upon exertion in 1982, 1985 and in early 1986.

Nelsen first sought psychiatric care because of increasing problems of depression in June 1987, following his suspension from employment. He saw Dr. Byron Eliashof who diagnosed an adjustment disorder and depression.

In September 1987, Nelsen moved to Edmonds, Washington where he continued to suffer worsening depression. He saw a succession of psychiatrists and, although he tried at one point to resume his career as a captain of a fishing vessel, he found that he was unable to perform the work because of his depression and anxiety. He thereafter went into a deep depression. He was hospitalized twice at Canyon Spring Hospital in Palm Springs, California, which specializes in the treatment of depression, and he attempted suicide.

The Nelsens later moved to Cathedral City, California where Nelsen has been under the treatment of Dr. Richard Torban, a psychiatrist. Over the course of the last few years, Dr. Torban has seen Nelsen on more than 60 occasions. Although Dr. Torban testified that Nelsen suffered from post-traumatic stress disorder ("PTSD") as a result of the flooding incident, he also indicated that Nelsen was observed to have all of the symptoms of a major depressive disorder, including a depressed mood for greater than two weeks, sleep impairment, weight gain, decrease in energy level, concentration and attentional deficits, loss of ability to enjoy himself, suicidal ideation and self-recrimination. The evidence further indicates that Nelsen has experienced bruxism or tooth grinding caused by the stress arising out of his depressive disorder. The depression suffered by Nelsen has further resulted in substantial strain on his marriage and has caused impotence.

### G. *Post–Traumatic Stress Disorder*

■ Nelsen's experts testified that Nelsen suffered PTSD as a result of the incidents aboard the Kila. PTSD is a severe psychological disorder caused by a traumatic event and evidenced by a variety of symptoms, including anxiety, phobic-avoidance reaction, insomnia, restlessness, fatigue, irritability, startle reaction, repetitive nightmares, impaired concentration and memory, sexual inhibition and social withdrawal. Many of these symptoms, however, are also common to patients experiencing severe depression.

The *Diagnostic and Statistical Manual of Mental Disorders* (Third Edition–Revised), commonly known as "DSM–III–R", sets forth the recognized diagnostic criteria for PTSD. Pursuant to DSM–III–R, a diagnosis of PTSD can be made only if the symptoms are preceded by a "recognizable stressor" which is "an event that is outside the range of human experience, and that is potentially psychologically traumatic—e.g. a serious threat to one's life or personal physical integrity, destruction to one's home or community, or seeing another per-

son who is mutilated, dying or dead, or the victim of physical violence."

After having considered the testimony of all of the witnesses, particularly those witnesses with maritime experience, and assessing their credibility, the court finds that the events aboard the Kila do not meet the threshold criteria for PTSD. The overheating and cable control problems and the flooding incident were not outside the range of usual human or seamen experience, nor would they be markedly distressing to almost anyone. None of these incidents posed any serious threat to anyone's life or physical integrity.

Furthermore, the incidents aboard the Kila were not beyond Nelsen's range of experiences. Although it is reasonably foreseeable that these events could contribute to a depressive disorder, I find that it is not reasonably foreseeable that they would have been so markedly distressing as to cause Nelsen to suffer PTSD. The evidence showed that Nelsen had experienced several maritime events which involved far greater potential for harm than any of the events aboard the Kila. Nelsen acknowledged that he had been involved in other far more serious incidents aboard other vessels in the Bering Sea, including a serious flooding incident, a complete loss of power incident and a collision with another freighter.

Moreover, in October 1986, approximately three months prior to the flooding incident aboard the Kila, Nelsen was involved in a serious maritime accident aboard his own fishing vessel, the Spirit. While several miles off the leeward coast of Oahu, late at night, the Spirit had a diesel engine fire, and then flooded to the point where the engines and generators were submerged and ceased operating. The Spirit had no radios, no flares, or other emergency signaling devices. The only pump aboard the Spirit was lost during the incident. The Spirit drifted for many hours before it was eventually rescued by a navy salvage tug passing through the area. During this incident, Nelsen was described as panicking by the other passenger on board, Larry Pranther ("Pranther").

Given Nelsen's prior experiences, the fact that none of the crew members or any of the personnel at the Marine Center noticed any significant change in Nelsen's personality, demeanor or behavior following the flooding incident and the fact that Nelsen continued to attempt to develop a business focused upon maritime activities following the Kila events, it is not likely that Nelsen suffered PTSD from any of the events which occurred on the Kila.

Nelsen's medical experts have placed great significance on the immediate onset of symptoms following the flooding incident. Nelsen's experts maintain that these symptoms were the result of a panic attack and indicated the onset of PTSD. Nelsen's experts have acknowledged, however, that the symptoms could have been due to a heart condition.

Based on the fact that Nelsen told his treating cardiologists shortly after the flooding incident that the symptoms complained of started during the flooding incident when Nelsen was under stress and running up and down the stairs from the bridge to the engine room, and further based on the determination made after the flooding incident that one of Nelsen's coronary arteries had a 70% to 80% blockage, the fact that Nelsen previously experienced heart symptoms, and considering the facts and circumstances of the flooding incident itself, including the fact that Nelsen appeared relatively calm and collected throughout the incident, I find that Nelsen did not experience a panic attack during or after the flooding incident. The symptoms were in all likelihood related to Nelsen's coronary artery disease brought on by physical exertion and the stress of the incident. The symptoms in question did not represent the onset of PTSD.

Nelsen's principal medical experts, Drs. Poletti, Torban, Weicker and Scrignar, also relied heavily on Nelsen's statements that he has experienced virtually all of the classic PTSD symptoms. However, I am not persuaded that Nelsen in fact suffered the full range of PTSD symptoms, based on the evidence indicating a lack of candor on the part of Nelsen, and in light of the

testimony at trial that Dr. Poletti provided Nelsen with the DSM–III–R list of PTSD symptoms.

The evidence presented at trial indicating a lack of candor on the part of Nelsen was substantial. For instance, despite the seriousness of the Spirit incident and Nelsen's reaction to it at the time, Nelsen did not disclose the existence of this incident to any of his treating doctors, to defense counsel in the course of discovery or to defense experts during their examinations until after the incident had been discovered by RCUH. However, Nelsen did contact Pranther, the other passenger aboard the Spirit at the time of the incident, and asked him if he had been contacted by anyone concerning the litigation.

Nelsen also was not forthright with his treating physicians with respect to his medical history pertaining to coronary artery disease and heart symptoms. Nelsen consistently denied having heart problems to his treating psychiatrists and psychologists. Nelsen also specifically denied having any heart symptoms prior to January 1987, although the medical records indicate chest pain and symptoms on exertion in the early 1980's.

Nelsen also failed to disclose to his treating physicians the ethical and conflict of interest charges and the true nature of the circumstances surrounding his discharge. Instead, he told them that he left the employ of RCUH due to his anxiety and concerns about the safety of the Kila or that he had been fired for being a "whistle blower". Nelsen was not forthright with his physicians concerning any of the findings made by the hearings officer. As discussed more fully below, it appears clear that the charges made against Nelsen and the circumstances of his discharge have played a major role with respect to his emotional problems. Nelsen's treating physicians did not have an opportunity to fully evaluate those circumstances when diagnosing Nelsen's condition because Nelsen did not disclose all of the facts surrounding his discharge.

Further examples of evidence indicating a lack of candor on the part of Nelsen include the following: Nelsen admitted on the witness stand that he had lied on his RCUH job application about receiving a college degree in business administration. He also acknowledged signing a life insurance application on December 27, 1987, in which he denied having any mental disorder, chest pain, discomfort, tightness or other disorder of the heart or blood vessels; denied being treated by any doctor in the previous five years, except for a broken toe and hernia; denied being advised to have any diagnostic tests, hospitalization or surgeries in the previous five years; denied having any x-rays or EKG's within the prior five years; and denied being on any medication. The medical records in evidence demonstrate that these representations made on the life insurance application are false.

The substantial evidence concerning Nelsen's lack of candor together with the evidence that Nelsen reviewed the diagnostic criteria of PTSD before reporting the full range of classic PTSD symptoms to his principal treating physicians cause the court to doubt the accuracy of the history that Nelsen suffered all or most of the PTSD symptoms.

Finally, certain aspects concerning Nelsen's conduct also appear to be inconsistent with symptoms associated with PTSD. During his testimony in court and in statements to physicians and attorneys, he has appeared eager, rather than reluctant, to describe in detail the events aboard the Kila. Indeed, although he claims to have suffered significant memory loss and an inability to concentrate, there are numerous instances during the course of this litigation in which Nelsen reported in great detail aspects of his employment with RCUH and the various Kila events. Furthermore, he was quite calm rather than aggravated or agitated when testifying about the Kila events. In contrast, however, Nelsen was very agitated when discussing issues surrounding his discharge.

Although I am persuaded that Nelsen did not suffer PTSD as a result of the Kila events, I do believe that Nelsen has suffered a major depressive disorder, based on

the findings made with respect to Nelsen's physical symptoms and the evidence demonstrating that Nelsen has had significant and substantial emotional and adjustment problems in recent years for which he has received extensive treatment, including two hospitalizations. The results of the objective testing performed by Dr. Weicker, Nelsen's psychologist, also support the diagnosis of a major depressive disorder.

I find, however, that Nelsen's serious depression is due in large part to the events surrounding the ethics charges made against him and his discharge. It appears clear that Nelsen's depression fully developed after his termination, as supported by the fact that he first sought psychiatric care after his discharge. Moreover, Nelsen himself has acknowledged some relationship between his emotional distress and the actions of his supervisors. In an "Employee's Report of Industrial Injury", dated June 3, 1987, Nelsen stated his belief that his symptoms and emotional distress were "due to the hostile reactions of [his] supervisor and superiors." (Exhibit 623).

It is also significant that Nelsen's demeanor in court changed dramatically when testifying about the discharge issues. He appeared quite aggravated and agitated during his testimony concerning his termination, which I believe is an indication that the discharge issues have played a major role with respect to Nelsen's emotional distress.

In summary, I am persuaded that Nelsen's discharge and the ethics charges made against him caused Nelsen to suffer serious depression. Nevertheless, after considering all of the medical expert testimony and the circumstances of this case, including Nelsen's extensive medical history and reports to physicians, I find that the Kila events contributed to Nelsen's depressive disorder. I find, based on the evidence, that twenty-five (25) per cent of Nelsen's depressive disorder is a result of the Kila events in question, and that seventy-five (75) per cent of Nelsen's depression is due to the events surrounding the ethics charges and his discharge.

The evidence indicates that Nelsen has responded well to treatment. I find that he is not disabled for employment purposes at the present time, and it appears that he will require minimal psychiatric treatment in the future.

## III. DISCUSSION

### A. *Agency—Suits In Admiralty*

RCUH previously moved for summary judgment, arguing that under the Suits in Admiralty Act ("SIAA"), 46 U.S.C.App. §§ 741–752, Nelsen's exclusive remedy is against the United States, the Kila's owner. The SIAA, § 745, provides that in an action "against an agent or employee of the United States or of any incorporated or unincorporated agency thereof whose act or omission gave rise to the claim," if a remedy is provided by the SIAA, it shall be the exclusive remedy. The SIAA does not itself provide a cause of action, it acts only as a waiver of the sovereign immunity of the United States in admiralty cases.

In order to invoke the exclusivity provision, the vessel must either be owned by, in possession of, or operated by or for the United States. SIAA, § 741. *See Trautman v. Buck Steber, Inc.*, 693 F.2d 440 (5th Cir.1982) (citing *Reed v. The Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963). Since the purpose of the statute was to prevent the seizure of merchant vessels of the United States, the Supreme Court interpreted this provision rather broadly. *Johnson v. United States Ship. Ed. E. Fleet Corp.*, 280 U.S. 320, 326, 50 S.Ct. 118, 120, 74 L.Ed. 451 (1930). However, subsequent case law indicates that mere government ownership, without more, is not sufficient to invoke exclusivity. *Bowman v. Pan American World Services*, 704 F.Supp. 695 (E.D.La.1989). If a ship is owned by the United States, but not operated by or for it by an entity that satisfies the common law definition of an agent, courts have held that the exclusivity provision does not apply. Such words as employer, agent, independent contractor, etc., however, are not decisive. The court must look at the venture as a whole. *Petition of*

*the United States*, 237 F.Supp. 434, 436 (E.D.N.C.1964).

■ In addition, § 742 precludes application of the exclusivity clause unless Nelsen's suit is also one that could be maintained if the Kila were privately owned. 46 U.S.C.App. § 742. *See also United States v. United Continental Tuna Corp.*, 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976). A claim for personal injuries is within the court's admiralty jurisdiction if the actions complained of occurred on or over navigable waters and the alleged wrong bears a significant relationship to traditional maritime activity. *Executive Jet Aviation v. City of Cleveland*, 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972); *In re Holoholo Litigation*, 557 F.Supp. 1024, 1029 (D.Haw.1983).

In ruling on the summary judgment motion the court held that the Kila was a public vessel within the meaning of the SIAA and § 781 of the Public Vessels Act, 46 U.S.C.App. §§ 781–790 ("PVA"). *Nelsen v. Research Corp. of the University of Hawaii*, 752 F.Supp. 350, 354 (D.Haw. 1990). The court also held that Nelsen's claim for emotional and psychological injuries could be maintained in admiralty if the Kila were privately owned. *Id.* at 355. However, the court held that there was a genuine issue of material fact as to whether RCUH acted as the government's agent in its operation of the Kila.

■ The use of general agency language in § 745 indicates that Congress intended that the traditional concept of agency should govern its application. *Petition of the United States*, 367 F.2d 505, 510 (3rd Cir.1966). The Restatement of Agency, 2d § 1(1) provides that "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." The primary piece of evidence as to the agency relationship between the United States Navy and RCUH is their bareboat charter agreement, which must be reviewed to determine to what extent, if any, (1) the government consent-. ed to allow RCUH to act on its behalf and (2) RCUH was subject to the government's control.

Courts have found that "control by the United States is the crucial element in determining whether a case falls within the jurisdiction provided by § 745." *Trautman*, 693 F.2d at 444. (extensive operation or direction of the vessel by government personnel would be required to make the vessel operated 'by the United States'); *LeBlanc v. United States*, 732 F.Supp. 709 (E.D.Texas 1990) (where pursuant to a general agency agreement, the agent agreed to operate a government vessel in accordance with directions from the government and the vessel's business was to be conducted for the government, the United States was the proper defendant); *Cruz v. Marine Transport Lines*, 634 F.Supp. 107 (D.N.J.1986) (where a public vessel was operated by a private company to transport oil for the government and the government retained the right to control and direct the overall operation, the company was an agent of the United States.) *See also Smith v. United States*, 346 F.2d 449 (4th Cir.1965).

Conversely, in *Padro v. Vessel Charters, Inc.*, 731 F.Supp. 145, 148–149 (S.D.N.Y. 1990), pursuant to a time-charter agreement, a party agreed to provide a vessel for the Navy's use, while retaining responsibility for day-to-day operational control, as well as the care, custody, and manning of the ship. Even thought the Navy retained the right to designate the cargo to be carried and the ports to be visited, the court held that since the charter agreement left the charter party with responsibility for the crew and did not unambiguously articulate an intent to pass liability for a seaman's personal injury to the United States, the charter party retained liability for the negligence of the crew and the unseaworthiness of the vessel.

In this case the agreement between the United States and RCUH required RCUH to maintain the KILA in good repair, maintain liability insurance on the vessel and hold the United States harmless from third party claims. The government did not consent to allow RCUH to act on its behalf.

The KILA was not operated for the United States or subject to its control. No one outside of the University of Hawaii ever gave directions or orders concerning either the day-to-day or overall operation, maintenance, or manning of the Kila. If anyone wished to use the vessel, they had to get permission from RCUH, not the United States. Looking at both the agreement and the venture as a whole, RCUH was not an agent of the United States. Accordingly, the SIAA is not a bar to Nelsen's claim against RCUH.

## B. *The Jones Act*

■ Nelsen sues in admiralty under the Jones Act, 46 U.S.C.App. § 688 (1958), alleging that he sustained his injuries due to RCUH's negligence. Under the Jones Act [a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, ... and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply.

*See also* the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq. In passing the Jones Act, Congress extended the same special statutory protection to seamen as it had extended to railway workers because of a high rate of injury to workers in these fields. *Lewy v. Southern Pacific Transportation Company*, 799 F.2d 1281, 1288 (9th Cir.1986); *Buell v. Atchison Topeka and Santa Fe Railway Company*, 771 F.2d 1320, 1321–1322 (9th Cir.1985); *Toscano v. Burlington Northern*, 678 F.Supp. 1477 (D.Mont.1987).

Under FELA, an employer has been found to have a statutory duty to provide a safe place to work, including an emotionally safe place to work. *Adams v. CSX Transportation, Inc.*, 899 F.2d 536, 539 (6th Cir.1990). The Supreme Court has declined to address the issue of whether an "emotional injury" is cognizable under FELA as "an abstract point of law or a pure question of statutory construction," and instead has deferred to the factfinder, state statutes, and common law. *Atchi-*

son, *Topeka and Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 568, 107 S.Ct. 1410, 1417, 94 L.Ed.2d 563, 575 (1987). Several courts have determined that the statutory language of FELA is broad enough to include purely emotional injury. *Adams*, 899 F.2d at 538–39; *Lewy*, 799 F.2d at 1288; *Taylor v. Burlington Northern Railroad Company*, 787 F.2d 1309, 1313 (9th Cir. 1986); *Buell*, 771 F.2d at 1324; *Zanca v. Delta Steamship Lines, Inc.*, 246 F.Supp. 127 (E.D.Louisiana 1965); *McMillan v. Western Pacific Railroad Company*, 54 Cal.2d 841, 9 Cal.Rptr. 361, 357 P.2d 449 (1960) citing *Urie v. Thompson*, 337 U.S. 163, 180, 69 S.Ct. 1018, 1029, 93 L.Ed. 1282 (1949).

■ The legal causation burden under FELA and the Jones Act is minimal. If the employer's negligent act or omission played any part, however slight, in bringing about the injury, the employer is liable. *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957); *Taylor*, 787 F.2d at 1313. The "slight negligence" necessary to support an action under FELA is defined as a failure to exercise great care and that burden of proof is much less than the burden required to sustain recovery in ordinary negligence actions. *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969).

In *Rogers* the Court held that:
[u]nder this statute [FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence.

352 U.S. at 506, 77 S.Ct. at 448. "Since liability under the Jones Act is the same as that established by Congress under the FELA, the Supreme Court has adopted the *Rogers* statement of causation with respect to Jones Act proceedings." *Curry v. United States*, 327 F.Supp. 155, 163 (N.D.Calif.1971), citing *Ferguson v. Moore–McCor-*

*mack Lines*, 352 U.S. 521, 523, 77 S.Ct. 457, 458, 1 L.Ed.2d 511 (1957). Unlike general maritime law, proximate cause is not required. *Litherland v. Petrolane Offshore Const. Services*, 546 F.2d 129, 132 (5th Cir.1977). "Under the *Rogers* standard, plaintiff need not show that the conditions aboard ..., or the stresses and strains placed upon [plaintiff] were the sole cause or main cause or even a significant cause of his injuries; they need only have been a contributing cause." *Curry*, 327 F.Supp. at 164.

FELA "encompasses all reasonably foreseeable injuries which result from a railroad's failure to exercise due care with respect to its employees." *Buell*, 771 F.2d at 1322. However, the foreseeability requirement has been minimized. It is "not necessary that respondent be in a position to foresee the exact chain of circumstances which actually led to the accident." *Ferguson*, 352 U.S. at 523, 77 S.Ct. at 458. It is only necessary that the injuries be true and significant. *Hagerty v. L & L Marine Services, Inc.*, 788 F.2d 315 (5th Cir.1986) rehearing en banc denied 797 F.2d 256 (1986).

▉▉▉▉ Courts have generally looked to state law and common law for guidance as to what foreseeability and medical causation standards to apply in negligent infliction of emotional distress cases. *Atchison*, 480 U.S. at 557, 107 S.Ct. at 1410; *Gaston v. Flowers Transportation*, 866 F.2d 816, 820 (5th Cir.1989); *Buell*, 771 F.2d at 1322. Since the events at issue in this case took place in Hawaiian waters and the law suit was filed in the District of Hawaii, the court will look to Hawaii law for guidance. In Hawaii the foreseeability standard applied to non-bystander mental stress cases is that a defendant can expect liability in a

situation where a "reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *In Re Hawaii Federal Asbestos Cases*, 734 F.Supp. 1563 (D.Hawaii 1990); *Rodrigues v. State*, 52 Haw. 156, 472 P.2d 509 (1970). In Hawaii there is no requirement that there be physical manifestations of the mental distress suffered. The courts require only that the actual distress be "serious".[1] The courts' past preoccupation with physical symptoms of emotional distress have stemmed from a concern about feigned illness and expanding liability. However, modern psychiatric and psychological examination techniques have all but eliminated this danger. (*See also Plaisance v. Texaco, Inc.*, 937 F.2d 1004, 1010–1011 (5th Cir.1991)). It is for the fact finder to determine the genuineness of the claim. *Campbell v. Animal Quarantine Station*, 63 Haw. 557, 564, 632 P.2d 1066, 1070–1071 (1981). Once the trial court is satisfied that the distress is serious, the duration and symptoms of the distress affect the amount of recovery. *Id. See also Masaki v. General Motors*, 71 Haw. 1, 780 P.2d 566 (1989).

In this case it is clear that Nelsen has suffered serious emotional distress. Sufficient evidence was presented to indicate that Nelsen has experienced severe depression causing sleep impairment, weight gain, impotence, bruxism, chronic fatigue, social withdrawal, suicidal ideation, as well as substantial difficulties with his marriage.

RCUH notes that since *Buell*, the Ninth Circuit has not addressed the issue of whether purely emotional injuries are compensable under the Jones Act and urges the court to follow decisions of other circuits, citing e.g. *Gaston* and *Plaisance*.

---

1. Under Hawaii law, a plaintiff-bystander need not exhibit physical manifestations of emotional distress; the only limitations are that plaintiff's distress be foreseeable and serious. In *Leong v. Takasaki*, 55 Haw. 398, 520 P.2d 758 (1974) the Hawaii Supreme Court sought an objective standard of proof as to the seriousness of the distress in order to assess damages. "Outlining the difference between primary responses, typified by anger, grief, and shock, and secondary responses, termed traumatic neurosis, which may

or may not result in physical injury, the court held that the 'plaintiff should be permitted to prove medically the damages occasioned by his mental responses to defendant's negligent act,' whether or not there was any apparent injury." Linda M. Paul, Note, *Masaki v. General Motors Corp.:* Negligent Infliction of Emotional Distress and Loss of Filial Consortium, 12 U.Haw. L.Rev. 215, 223 (1990) (citing *Leong* at 413, 520 P.2d at 766–767).

However, *Gaston* held that a plaintiff could recover for purely emotional injuries if he also suffered a physical injury. "*Gaston* leaves open the question whether a plaintiff may recover for purely emotional injuries under a zone of danger theory." *Plaisance v. Texaco, Inc.*, 966 F.2d 166, 169 (5th Cir.1992). In *Plaisance*, the court determined that a vessel captain suffering from PTSD was not objectively threatened by a fire. Therefore neither *Gaston* or *Plaisance* reached the issue of whether a vessel captain could recover for purely emotional injuries under a zone of danger theory.

In this case Nelsen was no bystander; he was squarely within the zone of danger in connection with the Kila events in question. As the captain, responsible for the operation of the vessel at sea and for his own safety as well as that of the crew, Nelsen was much more than a mere observer of a potential disaster.

RCUH also argues that as an experienced ship's captain, Nelsen's reaction was not that of a "reasonable person normally constituted." I find, however, that it was not unreasonable for a person in Nelsen's position with responsibility for himself and the crew to experience depression as a result of his involvement in a succession of incidents caused by equipment failure and unseaworthy conditions. It is reasonably foreseeable that the events aboard the Kila could contribute to a depressive disorder.

 Based on the evidence presented, I find that RCUH was negligent when it sent the Kila out to sea at the time of the January 1987 flooding incident without a working bilge alarm and with inadequate and defective bilge pumps. I also find that it was negligent to order the Kila out to sea at the time of the overheating incident in September 1986 without lagging surrounding its exhaust stacks. The incidents referred to above and the unseaworthy condition of the Kila, discussed below, contributed to Nelsen's depression.

## C. General Maritime Law

 Under general maritime law the owner/operator of a vessel has an absolute duty to provide a seaworthy vessel. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 542, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); *Hudson Waterways Corp. v. Schneider*, 365 F.2d 1012, 1014 (9th Cir.1966). This duty is not dependent on a finding of knowledge or negligent conduct; it is liability without fault. *Mitchell*, 362 U.S. at 549, 80 S.Ct. at 932. A "seaworthy" vessel is one that is reasonably fit and suitable for its intended use. *Id.* at 550, 80 S.Ct. at 933; *Litherland*, 546 F.2d at 132. General maritime law also requires that the vessel be reasonably fit to enable the crew to perform their duties with reasonable safety. *Reinhart v. United States*, 457 F.2d 151, 152 (9th Cir.1972).

RCUH asserts that no court has allowed a claim for pure emotional injury under general maritime law of unseaworthiness, citing *Gaston; Kiffe v. Neches–Gulf Marine Inc.*, 709 F.Supp. 743 (E.D.Tex.1989); *Klineburger v. Maritrans*, 404 Pa.Super. 490, 591 A.2d 314 (1991) (citing *Sosa v. M/V Lago Izabal*, 736 F.2d 1028 (5th Cir. 1984) and *Bartholomew v. Universe Tankships, Inc.*, 279 F.2d 911 (2d Cir.1960)). However, *Gaston* and *Kiffe* are bystander cases, *Sosa* and *Bartholomew* never reached the issue of pure emotional injuries, and *Klineburger* looked to Pennsylvania law to determine whether a seaman could recover for purely emotional injuries where there was no outrageous conduct, appellant was not personally threatened with harm and did not witness a physical injury to any third person.

 "Seaworthiness" is to be determined by the factfinder. Where a plaintiff pleads under both the Jones Act and general maritime law, an evidentiary showing of negligence will also establish unseaworthiness. *Lee v. Pacific Far East Line*, 566 F.2d 65, 67 (9th Cir.1977).

 However, plaintiff must prove proximate causation to maintain an action under general maritime law. That is, defendant's act or omission (creating an unseaworthy condition) must have played a substantial part in bringing about or actually causing the injury; and the injury was

either a direct result or a reasonably probable consequence of the act or omission. *Johnson v. Offshore Exp., Inc.,* 845 F.2d 1347, 1355 (5th Cir.1988). However, there may be more than one proximate cause. *Litherland* 546 F.2d at 132. If the defective equipment or unsafe condition of a vessel is the proximate cause of individual's particular injury, then the vessel is unseaworthy as to that individual. *Id.* Courts have previously found that a vessel was unseaworthy when a bilge alarm did not work and two or three bilge pumps were inadequate to pump accumulated seawater out of the bilges. *Lasseigne & Sons v. Bacon,* 1987 A.M.C. 2251, 2257, 1987 WL 26610 (D.Ore.1987).

I find that the Kila was unseaworthy when she was sent out on cruise with the following: (1) uninsulated exhaust mufflers and stacks, (2) sticking cable controls, (3) a broken pipe fitting, the lack of watertight integrity between the shaft alleys and engine room, inadequate and defective bilge pumps and no bilge alarm.

As to proximate cause, I find that the unseaworthiness of the Kila did not cause or in any way contribute to a post-traumatic stress disorder on the part of Nelsen. However, the Kila's unseaworthiness did play a substantial part in bringing about a portion of Nelsen's depression and this depression was a reasonably probable consequence of RCUH's failure to maintain the Kila in a seaworthy condition.

If a plaintiff establishes proximate cause by a preponderance of the evidence, a defendant must prove in turn that it exercised "due diligence". *In the Matter of: Oil Spill of the Amoco Cadiz,* 954 F.2d 1279, 1300 (7th Cir.1992). To escape liability a ship owner/operator must show exactly what was done and that what was done was all that reasonably could have been done under the circumstances. This duty is frequently delegated to the master, the crew, or some other agent. However, the exercise of due diligence will not insulate an owner/operator from negligent failure to furnish seaworthy equipment. *Mahnich v. Southern S.S. Co.,* 321 U.S. 96, 100, 64 S.Ct. 455, 457, 88 L.Ed. 561 (1944).

In this case RCUH asserts the primary duty doctrine as a contributory negligence defense, citing *Reinhart v. United States,* 457 F.2d 151 (9th Cir.1972) and *Walker v. Lykes Bros. S.S. Co.,* 193 F.2d 772 (2d Cir.1952). RCUH argues that Nelsen failed to perform duties imposed upon him by his employment and that this failure was the cause of his injury. In both *Reinhart* and *Walker* the court held that the injured seaman was contributorily liable for injuries he received from defective equipment that he knew about and had the duty and opportunity to repair. However, the Ninth Circuit has also held that where there was no proof that the libelant had assumed a duty and responsibility to maintain and repair, there is no contributory negligence. *Reinhart,* 457 F.2d at 155, citing *Hudson Waterways,* 365 F.2d at 1016.

No evidence was presented to the court that indicated Nelsen had assumed a duty to install, maintain, and repair equipment such as bilge pumps and a bilge alarm as part of his responsibilities as master of the Kila. To the contrary, those types of duties were delegated to the port captain and the head machinist. The court finds the primary duty doctrine to be inapplicable in this case.

D. *Intentional Infliction of Emotional Distress*

Nelsen asserted in his first and second amended complaints and at trial that he repeatedly requested that repairs and modifications be made in order to render the Kila seaworthy. In retaliation, Nelsen claims that he was subjected to intentional infliction of mental distress by defendant which culminated in his discharge.

Intentional infliction of emotional distress requires that (1) the conduct be intentional or reckless, (2) the conduct be extreme and outrageous, (3) there be a causal connection between the wrongful conduct and the emotional distress, (4) the emotional distress be severe. Recklessness requires that the defendant must know, or have reason to know, the facts which cre-

ate the risk. Restatement, Torts, 2d § 500, comment a. To be reckless is to be something more than negligent. I find that there was insufficient evidence that RCUH's conduct was either intentional or reckless. I also do not find that RCUH's conduct was extreme and outrageous. Therefore, Nelsen cannot recover for the tort of intentional infliction of emotional distress.

### E. Damages Under The Jones Act and General Maritime Law

Nelsen has presented damage claims under both the Jones Act and general maritime law of unseaworthiness. Previously recovery was broader under general maritime law of unseaworthiness than under the Jones Act. However, the Supreme Court has recently held that there should be uniformity in this area and has deferred to the statutory standards for recovery. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). The Court sought to eliminate inconsistency between tort recovery under general maritime law and statutory causes of action (Jones/FELA).

Nelsen has requested the following under the Jones Act and general maritime law: 1) past earnings, 2) future earnings, and 3) mental pain and suffering and loss of enjoyment of life. He has also requested past and future medical expenses and legal expenses under maintenance and cure.

### 1. Past Earnings

Although Nelsen testified that he would have returned to the Alaska fisheries, if he were able to work, where he expected to make more than $125,000 a year in the crab fishing industry, there was also evidence presented that Nelsen had lost interest in the very demanding lifestyle associated with previous fisheries employment prior to coming to Hawaii. For example, when Nelsen left the crab fishing industry and applied for a job in Hawaii, he represented that he had decided to make a career change, that he was looking for a more stable and permanent position rather than a seasonal job, that he was looking for a job with long-range career potential, and that he was interested in obtaining a comprehensive benefits package which he did not have in the crab fishing industry. The evidence also indicated that in 1986 there was a resurgence in the Alaska king crab stocks and in 1987 an increase in the number of fishing vessels along with a demand for licensed masters. Yet Nelsen sought to remain in Hawaii either in the employ of RCUH or as master of a fishing vessel (the Kana Keoki) based in Hawaii. After his discharge by RCUH Nelsen applied for a job with the University of Alaska Marine Center, not with the crab fishing industry.

I find that Nelsen's claim that, but for the negligence of RCUH, he would have made more than $125,000 a year crab fishing in the Bering Sea following his discharge to be speculative and unsupported by the record. The court therefore determines that Nelsen is entitled to three years past lost earnings based on work with RCUH. Since I have determined that seventy five (75) per cent of Nelsen's depression is due to events surrounding the ethics charge and his discharge from employment, which are not compensable under the Jones Act or general maritime law under the facts of this case, RCUH is liable for only twenty five (25) per cent of Nelsen's expected RCUH earnings in the three years since his discharge from RCUH employment, or $34,000.00 × 3 × .25 = $25,500. *See e.g. Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1355 (5th Cir.1988); *Buchalski v. Universal Marine Corp.*, 393 F.Supp. 246, 249 (W.D.Wash.1975), wherein fault/damages were apportioned.

### 2. Future Earnings

With regard to future earnings, I find that Nelsen is not disabled for purposes of future employment. Therefore, no future earnings are awarded.

### 3. Mental Pain and Suffering and Loss of Enjoyment of Life

With regard to mental pain, suffering, and loss of enjoyment, I find that Nelsen's emotional injuries have had a sub-

stantial impact on Nelsen's life. Based on the evidence presented as to the nature and extent of Nelsen's injuries, I award Nelsen $100,000 (twenty-five (25) per cent of $400,-000) for mental pain and suffering and loss of enjoyment of life.

### F. *Maintenance and Cure*

A shipowner/employer has an ancient obligation to care for a seaman injured during the course of maritime employment. *See Vaughan v. Atkinson,* 369 U.S. 527, 531–532, 82 S.Ct. 997, 999–1000, 8 L.Ed.2d 88 (1962). In the United States, maintenance and cure is a right created under general maritime law. The obligation includes payment for any injury or illness that manifests itself while employed, regardless of origin and whether it pre-existed seaman's employment. An illness can include purely psychological problems. *Harrell v. Air Logistics, Inc.,* 805 F.2d 1173 (5th Cir.1986).

The legal test for seaman status for purposes of maintenance and cure is the same as that established for determining status under the Jones Act. *Hall v. Diamond M Co.,* 732 F.2d 1246, 1248 (5th Cir.1984). To be eligible, a seaman must be "in the service of his ship" at the time of the illness or injury. *See Aguilar v. Standard Oil Co. of New Jersey,* 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943). Where the illness has not manifested itself until after a seaman has left the ship, the seaman must be able to offer "convincing proof of causal connection" between the alleged injury and his service on the ship. *Brahms v. Moore–McCormack Lines, Inc.,* 133 F.Supp. 283, 286 (S.D.N.Y.1955). In this case I find that there was a causal connection between the events aboard the Kila and Nelsen's later-diagnosed depression.

Under maintenance and cure a seaman is entitled to receive food and lodging of a kind and quality received aboard ship and necessary medical services to the point of maximum recovery. The point of maximum recovery is reached on the date the seaman's physician determines that it is probable that further treatment will result in no betterment of seaman's condition, or until incapacity is diagnosed as being permanent. *Gillikin v. United States,* 764 F.Supp. 261, 269 (E.D.N.Y.1991). Doubts are to be resolved in favor of the seaman. *Breese v. AWI, Inc.,* 823 F.2d 100 (5th Cir.1987).

I find that Nelsen is entitled to maintenance at a per diem rate of $24.00. *See* Exhibit 289 and *Gillikin v. United States,* 764 F.Supp. 261, 764 F.Supp. 270 (E.D.N.Y. 1991). After subtracting the period when Nelsen was in the employ of another ship and the 51 days he was hospitalized, the total maintenance due as of June 1, 1992, is $40,608.00. Since I find that Nelsen has essentially reached the point of maximum cure except for completion of a small amount of therapy and some dental work, Nelsen is entitled to that amount.

As for cure, at the time of trial Nelsen's past medical expenses totaled $106,128.41. Of these $28,405.14 were paid by RCUH. This leaves $77,723.27 in past net medical expenses owing to Nelsen. Nelsen is entitled to that amount.

Nelsen contends, supported by testimony from Dr. Torban, that his future medical expenses are expected to exceed $122,-974.00. However, Nelsen's appearance, demeanor and testimony at trial indicated that Nelsen now has a much improved outlook on life. He is jogging, has lost weight, his emotional problems are much reduced, his marriage appears to be holding up well. He also exhibited an excellent ability to concentrate and remember events, and could articulate his thoughts well. In fact, the only time the court observed Nelsen exhibit any emotional distress at trial was when he testified as to the events surrounding his discharge from employment. Nelsen's physician, Dr. Torbin, also testified that there has been a great deal of improvement in Nelsen's prognosis, and the defense experts indicated that Nelsen requires little to no further treatment. Although I find that plaintiff may benefit from further psychiatric treatment and is in need of some dental work as a result of the teeth grinding, Nelsen is

entitled to no more than $15,000 in future medical and dental expenses.

A seaman is also entitled to his unearned wages from onset of injury to the end of the voyage or, where an employment contract is for a longer period than end of voyage, wages for the full contract term. *Dowdle v. Offshore Express*, 809 F.2d 259, 264–65 (5th Cir.1987). In this case wages have been awarded as part of plaintiff's damage award under the Jones Act and general maritime law. "In admiralty, as elsewhere in the law, a litigant may not recover compensation for a single claim more than once." *Bartholomew v. Universe Tankships, Inc.*, 279 F.2d 911, 915 (2d Cir.1960).

An employer's wrongful refusal to pay maintenance and cure gives rise to an independent cause of action. If the failure to pay is "unreasonable", a seaman is entitled to compensatory damages for any aggravation of the injury. *Morales v. Garijak, Inc.*, 829 F.2d 1355 (5th Cir.1987). If the employer's refusal to pay maintenance and cure is willful and arbitrary, a seaman may recover attorney's fees and punitive damages. *Kopczynski v. The Jacqueline*, 742 F.2d 555, 559 (9th Cir.1984); *Sample v. Johnson*, 771 F.2d 1335, 1347 (9th Cir.1985) cert. denied 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1985). Nelsen maintains that defendant was arbitrary or capricious in failing to pay his maintenance and cure after January 1990, when defendant's medical expert, Dr. Marcus, declared that Nelsen had reached the point of maximum recovery. Since the court does not find that defendant's conduct was unreasonable, willful, arbitrary, or capricious, Nelsen is not entitled to punitive damages or attorney's fees under maintenance and cure.

## IV. ORDER

Based on the foregoing findings of fact and conclusions of law, it is hereby ordered that judgment shall enter in favor of Nelsen and against RCUH in the amount of $258,831.27, together with costs and interest provided by law.