**Stephen DEARBORN, Plaintiff–Appellant,**

**v.**

**MAR SHIP OPERATIONS, INC., Defendant,**

and

**Bay Ship Management, Inc., Defendant–Appellee.**

No. 95–56578.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 1997.

Decided May 8, 1997.

Michael Marmer, Wilmington, California, for plaintiff-appellant.

Dawn M. Schock, Michael L. Armitage and John M. Whelan, Keesal, Young & Logan, Long Beach, California, for defendant-appellee.

Before: SKOPIL, PREGERSON, and REINHARDT, Circuit Judges.

## OPINION

REINHARDT, Circuit Judge:

We must determine on this appeal whether, at the time plaintiff Dearborn was injured, defendant Bay Ship Management, Inc., was acting as an "agent or employee of the United States," within the meaning of the Suits in Admiralty Act, 46 U.S.C.App. § 745.

The pertinent facts of the case before us can be summarized briefly. Dearborn, a seaman employed by Bay Ship as a wiper aboard the United States Naval Ship KANE, was injured when he slipped and fell down a stairway that led from the deck of the vessel into the engine room. At the time of the injury, the KANE was owned by the United States through the United States Navy, Military Sealift Command, but chartered to Bay Ship under the terms of an agreement entitled "Performance Work Statement–Military Sealift Command–Special Mission Oceanographic and Hydrographic Survey Ships."

Dearborn brought suit against Bay Ship alleging causes of action under the Jones Act, 46 U.S.C.App. § 688, and general maritime law for negligence and unseaworthiness. In July 1995, Bay Ship moved for summary judgment, arguing that Dearborn's sole remedy lay against the United States. The district court agreed, and granted summary judgment in favor of Bay Ship. Dearborn appeals, and we affirm.

## DISCUSSION

Through the Suits in Admiralty Act of 1920, 46 U.S.C.App. §§ 741–752, the United States has broadly waived its sovereign immunity and consented to be sued "in cases where if [a vessel owned or operated by or for the United States] were privately owned or operated ... a proceeding in admiralty could be maintained." 46 U.S.C.App. § 742. Through the Public Vessels Act of 1925, 46 U.S.C.App. §§ 781–790, the United States has given further consent to be sued in its capacity as an owner of public vessels, subjecting itself to "the same liability ... as is imposed by the admiralty law on the private shipowner." *Canadian Aviator, Ltd. v. United States*, 324 U.S. 215, 228, 65 S.Ct. 639, 646, 89 L.Ed. 901 (1945).

■ In waiving its sovereign immunity through these acts, however, the government has rendered the remedies allowed by the waiver exclusive.[1] Section 745 of the Suits in Admiralty Act contains the following provision:

> Where a remedy is provided by the chapter it shall hereafter be exclusive of any other action by reason of the same subject matter against the agent or employee of the United States.

---

1. We have previously held that the Suits in Admiralty Act "does not itself provide a cause of action. It merely operates to waive the sovereign immunity of the United States in admiralty suits." *Nelson v. United States*, 639 F.2d 469, 473 (9th Cir.1980). Similarly, in *Allen v. United States*, 338 F.2d 160 (9th Cir.1964), we stated that "[i]t is not the purpose of the Public Vessels Act to give rights of action against public vessels in cases not previously cognizable in admiralty against private vessels, the purpose of the Act being only to remove the defense of sovereign immunity." *Id.* at 162 (citation and internal quotes omitted); *see also O'Connell v. Interocean Management Corp.*, 90 F.3d 82, 85 (3d Cir.1996); *Manuel v. United States*, 50 F.3d 1253, 1255 n. 1 (4th Cir.1995).

46 U.S.C.App. § 745. This exclusivity provision is, in turn, incorporated by reference in the Public Vessels Act at 46 U.S.C.App. § 782. We have held that "Section 745 mandates that an action in admiralty be brought solely against the United States. The remedy for an aggrieved party 'is exclusive of any action against the agent or employee of the United States whose act or omission gave rise to the claims.'" *Watts v. Pinckney,* 752 F.2d 406, 409 (9th Cir.1985) (citing *Doyle v. Bethlehem Steel Corp.,* 504 F.2d 911, 912 (5th Cir.1974); *Smith v. United States,* 346 F.2d 449 (4th Cir.1965)); *see also Kasprik v. United States,* 87 F.3d 462, 466 (11th Cir.1996); *Carter v. American Export Isbrandtsen Lines, Inc.,* 411 F.2d 1185, 1186 (2d Cir. 1969); *Petition of the United States,* 367 F.2d 505, 509 (3d Cir.1966). Accordingly, where a remedy lies against the United States, a suit against an agent of the United States "by reason of the same subject matter" is precluded.

In the appeal before us, Dearborn does not argue that an adequate remedy is not provided under either the Suits in Admiralty Act or the Public Vessels Act. Instead, he contends only that the district court erred in granting summary judgment because a genuine issue of material fact exists on the question of whether at the time of the injury Bay Ship was an "agent or employee of the United States." Accordingly, if we conclude that Bay Ship was the government's agent, it necessarily follows that Dearborn's suit against Bay Ship was precluded by § 745.[2]

What constitutes an agent under § 745 (and for the purpose of establishing the liability of the United States in actions of this nature, *see* n. 2) is a case of first impression for this circuit. Other courts that have set forth a definition of the term have used the common law definition of agent when analyzing relationships between the United States and private entities for purposes of admiralty law. *See Servis v. Hiller Sys. Inc.,* 54 F.3d 203, 207 (4th Cir.1995); *Favorite v. Marine Personnel and Provisioning, Inc.,* 955 F.2d 382, 388 (5th Cir.1992); *Petition of the United States,* 367 F.2d at 509; *Smith,* 346 F.2d at 453; *Nelsen v. Research Corp. of Univ. of Hawaii,* 805 F.Supp. 837, 847 (D.Haw.1992).

Neither of the parties quarrels with this approach. They differ only over the question of what principles emerge from the earlier court decisions. We, too, will use the common law definition of agency as a starting point for our analysis and will then consider the relevant case law as well as the specific provisions of the agreement between Bay Ship and the United States.

■ The Restatement of Agency defines an agency relationship as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958). In *Petition of United States,* the Third Circuit defined an "agent" as one who is "employed as a fiduciary, acting for a principal with the principal's consent and subject to the principal's overall control and direction in accomplishing some matter undertaken on the principal's behalf." 367 F.2d at 509 (citing Restatement (Second) of Agency § 14 N).

■ Two characteristics appear most often to be dispositive under the opinions that have directly confronted the question of whether a private entity under contract with the United States to operate a public vessel is an agent of the United States: in order to find that a charterer is an agent of the United States, 1)

**2.** Because of the way the parties argue the issues, this case comes before us in a somewhat artificial posture. The real question in cases of the type before us is whether or not a remedy lies against the United States. The agency issue is necessarily resolved when that question is answered. Liability lies only if the United States is responsible directly or because of an act of an agent. If it is determined to be liable, the charterer of the vessel is not, either because the charterer is not liable for the actions of the United States or because the charterer is the United States' agent. In the latter case, the exclusivity provision precludes the imposition of liability against the charterer. Although in the case before us the agency issue is presented by the parties at step two rather than step one, the identical analysis, both legally and factually, is applicable regardless of when the issue is considered. Moreover, the parties are not alone in their decision to raise the issue at the second step. *See Petition of the United States,* 367 F.2d 505 (3d Cir.1966); *Smith v. United States,* 346 F.2d 449 (4th Cir.1965).

the United States must exercise significant control over the charterer's activities—either day to day control or overall control and direction of the mission, and 2) the charterer must be engaged in conducting the business of the United States.[3]

■ The parties offer as evidence on the question whether Bay Ship was an agent of the United States, only the agreement between the United States Department of the Navy and Mar Ship Operations, to which Bay Ship Management was bound by assignment. That document entitled "Performance Work Statement–Military Sealift Command–Special Mission Oceanographic and Hydrographic Survey Ships," along with Dearborn's concession that the U.S.N.S. KANE was a "public vessel," constitute the universe of information available on review to answer the agency question.

A number of provisions in the agreement indicate that Bay Ship consented to operate the KANE on the government's behalf and subject to its overall control. First, the provision entitled "Scope of Work" states,

> The Contractor shall provide personnel, operational and technical support ashore and afloat, equipment, tools, provisions, and supplies to operate and maintain ten U.S. Naval Ships (USNS) which are public vessels of the United States Government under the operational and administrative

control of the Commander, Military Sealift Commander (COMSC). The ships are operated under four programs for the Naval Oceanographic Office (NAVOCEANO or Sponsor).

In addition, the provision entitled "Operational Control" states that

> Operational Control will be exercised by [Military Sealift Command] through the cognizant MSC Area Commander who shall promulgate sailing orders. The Sponsor Designated Representative (SDR) shall control and have authority over the performance of Government (Sponsor) missions. The Government shall obtain clearances to operate in foreign territorial waters and call at foreign ports.

Finally, the contract defines the mission of the ship as follows: "The mission of [the KANE] is to support the Navy's oceanographic survey programs which are conducted by Sponsor [Naval Oceanographic Office] personnel aboard ship."

These provisions seem clearly to define an agency relationship between the Military Sealift Command and Bay Ship. They unquestionably contemplate substantial government oversight and supervision—i.e., significant overall control and direction. Moreover, the KANE was to be used for government purposes in support of government missions. In line with the decisions of the other courts which have addressed the issue, we conclude

---

**3.** In this respect, "agent" may apply more broadly in this context than it does elsewhere, and may include in some cases entities properly defined as "independent contractors." As the Third Circuit held in *Petition of the United States:*

> As a matter of legal definition, "agent" of the United States is an appropriate characterization of such a contract operator of a public vessel as Mathiasen. The accepted distinction between "servant" and "independent contractor" may place Mathiasen in the latter category, since it is arguable that Mathiasen's day to day working of the ship was not subject to government control. *See* Restatement (Second) of Agency § 2. But an independent contractor, no less than a servant may be an agent in that he is employed as a fiduciary, acting for the principal with the principal's consent and subject to the principal's overall control and direction in accomplishing some matter undertaken on the principal's behalf. Restatement (Second) of Agency § 14 N.

367 F.2d at 509. *Cf. McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842, 853 (3d Cir.1996); *McFarlane*

*v. Esquire Magazine,* 74 F.3d 1296, 1303 (D.C.Cir.1996); *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1434–35 (3d Cir.1994); *Penthouse Int'l, Ltd., v. Barnes,* 792 F.2d 943, 946 (9th Cir.1986); *Phillips v. United States,* 792 F.2d 639, 645 (7th Cir.1986); *Grace Line, Inc. v. Todd Shipyards Corp.,* 500 F.2d 361, 373 (9th Cir.1974).

In certain other contexts and under certain other statutory schemes, however, "agent" and "independent contractor" have been characterized as mutually exclusive. *See, e.g., Hines v. United States,* 60 F.3d 1442, 1446 (9th Cir.1995) (holding that with respect to the Federal Tort Claims Act "[t]he critical test for distinguishing an agent from a contractor is the existence of federal authority to control and supervise the 'detailed physical performance' and 'day to day operations' of the contractor"). Our holding is expressly limited to the relationship between the United States and its contractors or charterers for purposes of suits in admiralty.

that the charterer was an agent of the government. Typical of the analysis undertaken in prior cases is the following excerpt from *Petition of United States:*

> Certainly, under the contract in this case Mathiasen owed the United States obedience and loyalty and was in significant ways subject to the government's direction and control. Mathiasen expressly agreed "to manage and conduct the business of the Government with respect to such tankers" as the government should furnish "solely in the public use or in the protection of the National interest or economy." The government was to prescribe "voyages and cargoes." While Mathiasen undertook to "man, victual and navigate" the ships, the government was empowered "to terminate the employment of the master or any member of the crew" as the public interest might dictate.... We think the general sense and specific details of this agreement disclose a relationship of principal and agent within the accepted legal conception of agency relationship.

367 F.2d at 509–510. *See also Smith,* 346 F.2d at 451 ("[W]e think the relevant portions of the agreement clearly demonstrate that the United States remained in the control of the vessel at all times, with only her physical conduct delegated to Marine."); *Favorite,* 955 F.2d at 388 ("Because 'the general statement of an agency concept ... include[s] any instrumentality through and by which the public vessels are operated,' MTL was an agent of the United States."). The basic relationship established by the contract at issue in this case, then, seems to set out a classic agency relationship: Bay Ship was employed to operate the KANE in the business of the United States, and, although it did not reserve the right to hire or fire individual crew members, the United States retained significant overall direction and control over the operation of the vessel.

In his attempt to argue that Bay Ship was not an agent, Dearborn relies heavily on the fact that Bay Ship, not the government, had operational control of the KANE. Dearborn points to provisions in the agreement requiring Bay Ship to man the vessel with personnel, perform maintenance and repairs, arrange for port services, and provide and maintain security. Although these provisions indicate Bay Ship had some operational control under the agreement, they are not inconsistent with the concept of agency. At best, these provisions support a finding that Bay Ship had day-to-day control of the vessel. They do not disprove that Bay Ship operated the vessel for the government, subject to its overall direction and control. In each case, the authority delegated to Bay Ship was delegated so that it could perform the business of the government.

Dearborn cites *Nelsen v. Research Corp. of Univ. of Hawaii,* 805 F.Supp. 837 (D.Haw. 1992), to support his reading of the contract. In *Nelsen,* the court held that although the government owned the vessel, the Research Corporation of University of Hawaii (RCUH) was not acting as its agent. As Dearborn correctly points out, the court based its decision in part upon certain provisions similar to those contained in the agreement now before this court. *See id.* at 847 ("In this case the agreement between the United States and RCUH required RCUH to maintain the [vessel] in good repair, maintain liability insurance on the vessel and hold the United States harmless from third party claims."). But those few provisions are where the similarity ends. The fundamental difference is that in *Nelsen* "[t]he [vessel] was not operated for the United States or subject to its control." *Id.* at 848. It was not engaged in the business of the United States government, but rather in the business of the University of Hawaii. *See id.* at 847. As the court in *Nelsen* noted, "the government did not consent to allow RCUH to act on its behalf." *Id.* at 847. Further, in making its determination that "[n]o one outside of the University of Hawaii ever gave directions or orders concerning either the day-to-day or overall operation, maintenance, or manning of the [vessel]," the court considered the agreement and the "venture as a whole." *Id.* at 848. Here, as we have pointed out, *supra,* the agreement provides that Bay Ship shall operate the KANE on the government's behalf and subject to its overall direction and control.

Dearborn also argues that the contract's indemnification clause supports his claim that Bay Ship is not an agent of the United States. That provision states:

H–12 INSURANCE

(a) During the period commencing with the delivery and terminating with the re-delivery of each ship the Contractor shall secure the customary full form Protection and Indemnity (P & I) marine insurance coverage ... on each ship.... The insurance coverage shall cover all liabilities in an amount of $100,000,000 per incident. Except as specifically provided herein the Contractor shall be responsible for the cost of such insurance, including deductibles.

(b) The Government and Contractor shall be named as co-insureds under the insurance policies.... [T]he Contractor does hereby agree to indemnify release and otherwise hold harmless the Government from any and all liability whatsoever which would be covered by the P & I insurance if the ships were privately owned. The Government shall be responsible for any such liability in excess of the Contractor's $100,000,000 insurance coverage per incident and shall indemnify, release and hold harmless the Contractor for such excess liability.

Dearborn argues that the provision demonstrates that the parties intended that Bay Ship, not the government, would be held responsible for any liabilities arising from the operation of the KANE.

We disagree. Not only do the insurance provisions not alter the nature of what otherwise seems to be a fairly clear agency relationship between the government and Bay Ship, but they appear to assume that actions will lie against the government and that the government will defend and control the litigation. Indeed, subsection (c)(i) of the insurance section explicitly provides that

As operators of public vessels for the United States, the Contractor may become involved in the litigation and possible compromise of claims Maintainable exclusively against the United States under the Public Vessels Act. The conduct of litigation on behalf of the United States is, however, reserved by law to the Attorney General and the U.S. Department of Justice Attorneys.

The fact that the government bargained for a provision in the contract whereby Bay Ship would be responsible for purchasing insurance to cover the government's liability exposure supports our conclusion that the parties intended to establish an agency relationship under which Bay Ship would operate the KANE on behalf of the government.

## CONCLUSION

Because we conclude that Bay Ship was operating the KANE as the agent for the government, Dearborn's action against Bay Ship is barred under 46 U.S.C.App. § 745. The district court's grant of summary judgment in favor of Bay Ship is affirmed.

AFFIRMED.