Isabella SERVIS, Administratrix of the Estate of Peter Thomas Humphrey, Plaintiff,

v.

HILLER SYSTEMS INC., Norfolk Shipbuilding and Drydock Corp., Valcon Sales and Services, Inc., Jason B. Nuss, Wayne Francis Muth, Edward Speary, III, Defendants.

NORFOLK SHIPBUILDING AND DRYDOCK CORP., Third–Party Plaintiff,

v.

UNITED STATES of America, Third–Party Defendant.

Civ. A. No. 2:94cv202.

United States District Court, E.D. Virginia, Norfolk Division.

June 29, 1994.

As Corrected July 6, 1994.

Frances Whitehurst Russell and Stephen C. Swain, Clark & Stant, Virginia Beach, VA, for Isabella Servis.

Donald Charles Schultz, James Long Chapman, IV, and Guilford D. Ware, Crenshaw, Ware & Martin, Norfolk, VA, for Hiller Systems, Inc., Jason B. Nuss, Wayne Francis Muth and Edward Speary, III.

George William Birkhead, Carter T. Gunn, and William Martin Dozier, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for Norfolk Shipbuilding and Drydock Corp.

Robert Martin Tata, Denham Arthur Kelsey, and Gregory N. Stillman, Hunton & Williams, Norfolk, VA, for Valcon Sales and Services, Inc.

Michael Anson Rhine, U.S. Attorney's Office, Norfolk, VA, Matthew A. Connelly, U.S. Dept. of Justice, Torts Branch, Civ. Div. and Richard T. Buckingham, U.S. Dept. of Justice, Trial Atty., Admiralty, Washington, DC, for the U.S.

*OPINION AND ORDER*

DOUMAR, District Judge.

This matter is before the Court on defendants' motions to dismiss and plaintiff's motion to remand the matter to the state court where it was originally filed. The United States made a special appearance in support of the plaintiff's motion to remand.[1]

1. By order entered April 29, 1994, the Court extended the time for the United States to an-

This case concerns the interaction between the saving to suitors clause of 28 U.S.C. § 1333 and the "exclusivity" provision of the Suits in Admiralty Act ("SAA"), 46 U.S.C.App. § 745. The question is whether a plaintiff may save his right to proceed in state court (with a jury) by naming only subcontractors as defendants, or whether these subcontractors should be considered "agents" for the purposes of the SAA and, therefore, the sole remedy should be against the United States in federal court (and without a jury). For the reasons discussed below, this Court holds that subcontractors performing the work contracted for by a prime contractor with the United States should be considered agents for the purpose of the SAA's exclusivity provision.

## I. Facts and Procedural History

### A. The Incident

Peter Thomas Humphrey was an electrical technician employed by a subcontractor of Norfolk Shipbuilding and Drydock Company (hereinafter "Norshipco"). (His employer is not a party to this suit.) At the time of the accident that gives rise to this proceeding, Humphrey was working in the engine room of the "CAPE DIAMOND." Plaintiff alleges that Humphrey along with a Coast Guard Lieutenant was asphyxiated by the carbon dioxide ("$CO_2$") released into the engine room during a faulty test of the fire suppression equipment. Plaintiff alleges that Humphrey's death was caused by the negligent acts of Norshipco and two of Norshipco's subcontractors, Valcon Sales and Services, Inc. (hereinafter "Valcon") and Hiller Systems Inc. (hereinafter "Hiller"). Plaintiff also names as defendants three Hiller employees, Jason B. Nuss, Wayne Francis Muth, and Edward Speary, III.

Plaintiff alleges that several errors were made both in the re-installation of the valve which contributed to the accident and in the conduct of the test itself. At the time of the re-installation of the aft tank main shut-off valve, plaintiff alleges several errors were made: 1) the valve was missing an arrow indicator which would permit visual confir-

mation that the valve was closed; 2) two bolts were used that were too long; 3) the valve was covered with lagging (insulation); and 4) the lagging was covered with a ¼ bypass valve which permitted $CO_2$ to bypass the main shut-off valve and flow directly into the manifold or header.

A test of the system was scheduled for March 3, 1993. The test requires a release of $CO_2$ in various areas of the ship. Norshipco had previously promulgated a company rule requiring all personnel to be evacuated before any testing of the $CO_2$ system.

Wayne Francis Muth and Edward Speary, Hiller employees, conducted the test on March 3, 1993. They decided to test the system in the engine room first. No order was ever given to evacuate the engine room. No effort was made to ensure that the engine room area was evacuated.

They intended to conduct a "puff test" by releasing a small amount of $CO_2$ into the engine room. First, one valve was opened to allow $CO_2$ to move from the main tank into the manifold or header. This valve was then supposed to be closed. Then a second valve was opened to release the gas into the test area and activate the alarm systems.

The idea was to let a small amount into the manifold using the first valve, to close the first valve, and then conduct the test by opening the second valve, releasing a "puff" of $CO_2$. However, the first valve was not completely closed when the second valve was opened resulting in a massive release of $CO_2$ into the test area (the engine room). The $CO_2$ asphyxiated plaintiff and a Coast Guard officer.

### B. Procedural History

On January 18, 1992, plaintiff filed a motion for judgment in Norfolk Circuit Court naming as defendants Norshipco, Valcon, Hiller, and Hiller employees, Nuss, Muth, and Speary. Plaintiff alleged that Hiller was both negligent and grossly negligent in the hiring and training and supervision of its employees, in the removal, repair, and re-installation of the valve, in the conduct of the $CO_2$ puff test, and in the hiring of subcon-

swer the third-party complaint in this matter

until ten days following the entry of this order.

tractors and their actions. Plaintiff made the same allegations against the three Hiller employees in their individual capacity. Plaintiff alleged that Valcon was both negligent and grossly negligent in its inspection and repair of the valve and its failure to replace a missing shut-off indicator plate or to warn others dependent on their work. Finally, plaintiff alleged that Norshipco was both negligent and grossly negligent in the hiring and supervision of the subcontractors and in its failure to evacuate the engine room or provide any warning. This complaint did not name the United States in either of its capacities (MARAD or the Coast Guard), nor did it name the prime contractor, MTL.

On February 16, 1992, Norshipco removed this action to this Court alleging that the complaint stated a federal question under the SAA or Public Vessels Act or both and that the exclusive remedy was against the United States in federal court.

Norshipco then filed a third-party complaint against the United States. In that complaint, Norshipco alleged that MARAD, MTL and the Coast Guard failed to provide advance notice of the test so that proper safety precautions could be taken; that MARAD, MTL and the Coast Guard failed to conduct the test in a proper manner and did not take reasonable precautions for the safety of persons on board the ship; and, that the CAPE DIAMOND was unseaworthy.

Subsequent to the removal, all of the defendants filed motions to dismiss the case arguing that plaintiff's sole remedy was against the United States. Plaintiff, however, filed a motion to remand based upon the saving to suitors clause of 28 U.S.C. § 1333 and its interpretation in *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). Both the motion to remand and the motions to dismiss turn on the same questions of law presently before the Court.

All parties briefed the issues and on April 21, 1994, this Court heard oral arguments on the issues. After argument, the Court requested that all of the parties submit any

additional authority or argument they desired on two issues. First, the Court requested authority on which forum—the state or federal court—was the proper place to resolve these questions. Second, the Court invited the parties to submit any relevant portions of the extensive contractual documentation.

After receiving these materials and taking them under consideration, the Court recognized the unique procedural stance of the case allowed the Court to consider facts outside of the pleadings with regard to the motion to remand but not for the motions to dismiss, despite the reality that both motions turned on the same issue. In order to avoid this procedural morass, this Court, by order dated June 1, 1994, converted the motions to dismiss to motions for summary judgment and provided a final opportunity to supplement the record with additional facts or argument. All parties have submitted these materials, and this matter is now ripe for decision.

### C. Relationship of the Parties

In 1985, the United States purchased the CAPE DIAMOND, a "roll on/roll off" cargo ship, through the United States Maritime Administration (MARAD), an agency of the U.S. Department of Transportation. The CAPE DIAMOND was purchased as part of the Ready Reserve Force (RRF). The RRF consists of over 90 vessels capable of transporting military cargo, fuel, equipment, munitions, and other supplies in support of the military forces of the United States. MARAD has the responsibility of maintaining the RRF, which entails making sure the vessels can be activated, crewed, and ready to sail within a period of 5 to 30 days. In order to accomplish this, MARAD contracts with private companies to maintain the RRF and, if necessary, to activate, crew, and operate the vessels.

The United States entered into a Ship Manager's Agreement with Marine Transport Lines, Inc. (hereinafter "MTL"). Pursuant to this agreement,[2] MTL and its contractors made extensive repairs and modifications to the CAPE DIAMOND. Part of

---

**2.** There appear to be several different incarnations of the agreement between MTL and MAR-

AD. While the parties suggest that the original agreement was entered into in November of

these modifications involved the low pressure $CO_2$ fire protection system.

In March of 1992, MARAD apparently contracted directly with Norshipco to "deactivate" the ship.[3] In October of 1992, Norshipco subcontracted some of this work to Hiller Systems Inc. Norshipco subcontracted with Hiller to test and inspect the $CO_2$ system. As part of its condition report to Norshipco filed in October 1992, Hiller reported that there were leaks in the aft tank valve. Hiller recommended replacement of the valve.

In or about November of 1992, a decision was made that CAPE DIAMOND would not be deactivated but instead put on "reduced operating status." Pursuant to this change, the deactivation contract was apparently replaced with a contract between MARAD and Norshipco.[4] Hiller remained a subcontractor to Norshipco under this contract. On December 3, 1992, Hiller was authorized to proceed with the recommended repairs. On December 15, 1992, Hiller removed the aft tank main shut-off valve (and other valves)

and sent them to Valcon for inspection, testing, and repair. On December 28–29, 1992, Valcon inspected and tested the valves and returned them to Hiller.[5] On or before January 4, 1993, Hiller replaced the valves in the CAPE DIAMOND using temporary employees. Plaintiff alleges that several errors were made in the re-installation of the aft tank main shut-off valve.

On March 1, 1993, Michael Ford, a representative of MTL, hired Hiller to recharge the $CO_2$ system and to repair known leaks, test the actuation and alarm devices, and certify the system to the Coast Guard and provide inspection certificates.[6] A test of the system was scheduled for March 3, 1993. Wayne Francis Muth and Edward Speary, also Hiller employees, conducted the test in the presence of a Coast Guard representative on March 3, 1993. Plaintiff was killed during the conduct of the test.

### D. Contractual Provisions

The Ship Manager's Agreement (the "SMA" or the "Agreement") is a lengthy

---

1986, they agree that contract No. DTMA91–88–C–80012 designates MTL as the agent of MARAD between February 29, 1988 to August 1, 1993.

Also in the Court's record of this case is contract No. DTMA92–92–C–203003. As part of a Freedom of Information Request, MARAD produced this agreement to counsel for Valcon, who submitted that portion of the contract to the Court during oral arguments. The submitted agreement is "issued by" MTL as "Ship Managers for DOT/MARAD." The offeror, *i.e.*, the winning bidder on the contract, was Norshipco. The contract is apparently for the "deactivation" of the CAPE DIAMOND.

In response to the Court's last request for additional information in this matter, Norshipco submitted an affidavit from Ernest Reilly, Jr., Vice President, Estimating and Contract Administration for Norshipco. In this affidavit, Reilly indicates that this second agreement (DTMA92–92–C–203003) governed the work on the fire suppression system at issue.

3. This contract has the same cover page as the Ship Manager's Agreement, *i.e.*, Standard Form 33 from the General Services Administration. It is dated May 11, 1992. The contract is issued by MTL as Ship Managers for MARAD. William Daraghy, apparently an employee of MTL's, signed the form as contracting officer for the United States.

4. This contract was not submitted to the Court by any party.

5. Valcon contends that it did not inspect the particular valve at issue in this case. They have submitted an affidavit of Leo Vincent Facenda, formerly an estimator with Valcon. In his affidavit, Facenda contends that, based on his personal recollection and review of the business records, Valcon never worked on any valves from the CAPE DIAMOND. Rather Valcon worked on valves from the sister ship CAPE DOMINGO. Furthermore, Facenda contends that none of the valves it did work on were of the type (4″ gate valve) alleged to have contributed to the accident in this case.

This factual issue, which remains in contention, is not material to the resolution of the agency issue. For the purposes of this motion, the Court will assume that Valcon did work on the valve and will consider only whether a sub-subcontractor such as Valcon is an "agent" for the purposes of § 745.

6. Again, this was pursuant to a separate agreement. On this occasion, rather than acting as a subcontractor of Norshipco's, Hiller was apparently hired directly by MTL. In his affidavit, Jason Nuss, Operations Manager with Hiller, states that he was contacted by Michael Ford, who was working for MTL as the Contracting Officer's Technical Representative coordinating the reactivation inspection required by the Coast Guard. Nuss attached his March 1, 1993 confirmation letter and the March 4, 1993 confirmation purchase order from MTL to his affidavit.

document with many attachments and annexes. At oral argument and again upon converting the motions to summary judgment, the Court directed the parties to submit any parts of this agreement which they found relevant, particularly those portions concerning responsibility for repairs and concerning the allocation of liability between the parties. The Court is now in receipt of a variety of materials on these subjects.

Several of the defendants have submitted portions of the contracts pertinent to this issue as well as affidavits from the relevant employees stating their understanding of the contractual relationships. The plaintiff has now submitted what it believes are the relevant portions of the SMA along with part of a Memorandum of Understanding which describes the operational relationships between MARAD, the Coast Guard, and the agents of MARAD such as MTL.

The United States never submitted any portion of the contract, relying instead on its position that "no portions of that contract are pertinent to this issue ... the United States submits that there is no basis in law for allowing subcontractors to attempt to bootstrap themselves into agent status by reference to excerpted portions of the ship manager's contract." However, upon conversion of the motions to summary judgment, the United States did submit the affidavit of Tim P. Roark, Sr., the contracting officer for all Ship Manager Contracts and General Agency Agreements for the RRF.

Review of the submitted portions of the SMA issued by MARAD to MTL reveals typical language assigning general responsibility for the ship to the prime contractor. Thus, MTL is to provide "management, personnel, operational and technical support, and supplies to maintain ships of the Ready Reserve Force (RRF) and operate when tasked as specified." Section C–1, 1.2. In slightly more specific language, the SMA describes the general duties of MTL in Phase IV, the Maintenance and Repair stage. The Ship Manager is to

> Equip, victual, supply, and arrange for the repair of the vessel including hull, machinery, boilers, tackle, apparel, furniture, equipment and spare parts, and including maintenance and voyage repairs and replacement, as directed to maintain the vessel in an efficient state of repair and condition.

Section C–5.4, 5.4.1.1.

Clearly contemplated as within the scope of MTL's agency under the SMA is the hiring of subcontractors to undertake portions of the work under the Agreement. Numerous provisions make direct and indirect references to hiring subcontractors (or sometimes "industrial assistance") to undertake work for which MTL is ultimately responsible. For instance, several sections outlining the Ship Manager's Duties all contain the same language indicating that this duty is to be fulfilled at least in part by the use of subcontractors. This language requires the Ship Manager to prepare specifications for contracts, seek competitive bids from contractors, and then award and supervise such projects on behalf of MARAD. Sections C–5.4, 5.4.1.4; 5.4.1.7; and 5.4.1.12. Furthermore, in "Technical Exhibit 8, Maintenance Measures" the SMA specifically provides for the use of Coast Guard certified contractors to inspect, test, and certify all fixed and portable carbon dioxide extinguishing systems. Section 81.01.

Finally, the Agreement outlines MTL's general responsibilities with regard to subcontractors:

> *Contractors.* The Ship Manager shall exercise due diligence in the selection of contractors. The fees and expenses of contractors utilized to aid in the performance of services and functions required herein on such terms and for such periods of time as the Ship Manager deems necessary, and are approved by the Government, shall be included in the costs to be reimbursed by MARAD. The Ship Manager shall promptly terminate any contractor not satisfactory to the Government upon written instructions from the Contracting Officer or his designated representative. The use of contractors shall be subject to a bonding requirement if determined by the Contracting Officer.

Section C–5, 5.4.1.31.

With regards to distributing liability among the parties, very little was submitted.[7] The plaintiff as well as counsel for Valcon did provide section H–22 which addresses the issue of insurance. That section reads as follows:

The government will self insure for all liabilities on this contract in accordance with current coverage for P & I, Hull and Machinery, and third person liability insurance. Gross negligence on the part of the Ship Manager will nullify this coverage. This coverage extends to the Ship Managers and their employees. The Ship Manager is required to insure that their subcontractors and vendors offering supplies and services under reimbursable provisions have adequate insurance.

Section H–22.

## II. Analysis

### A. The Saving to Suitors Clause

■ All of the parties agree that the facts of this suit state a claim in admiralty. The question is whether plaintiff, by suing only the subcontractors involved and not the United States or its prime contractor, can receive the benefit of the saving to suitors clause and bring this suit as an *in personam* case in state court.

■ The statute establishing the admiralty jurisdiction of the federal courts provides:

The district courts shall have original jurisdiction, exclusive of the courts of the States, of:

(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

28 U.S.C. § 1333. The leading Supreme Court case on the "saving to suitors" clause of this statute extensively reviews the history of admiralty jurisdiction and the saving to suitors clause and concludes that a claim brought pursuant to the general maritime law should not be removable under the federal courts' federal question jurisdiction.

*Romero*, 358 U.S. at 371–72, 79 S.Ct. at 480. Judge Clarke explained the effect of *Romero* in a 1990 opinion:

Despite the apparent grant of exclusive federal jurisdiction in admiralty and maritime cases [in § 1333], the "savings clause" is interpreted to reserve to suitors the right of a common law remedy "in all cases where the common law is competent to give it." ... The rationale underlying the Court's decision in *Romero* was that if maritime claims "arose under" the laws of the United States, defendant, by use of the removal statute, could eviscerate the tradiional choice of plaintiffs to elect a state law forum and remedy under the "saving to suitors clause" of 28 U.S.C. § 1331. Thus, it is now clear that, *except when there exists some basis for federal jurisdiction other than admiralty, (such as diversity jurisdiction), maritime litigation brought in state courts cannot be removed to federal courts.*

*Coley v. Dragon, Ltd.*, 138 F.R.D. 460, 464 (E.D.Va.1990) (citations omitted; emphasis added); *Lewis v. United States*, 812 F.Supp. 620, 622 (E.D.Va.1993) ("a general maritime claim brought in state court ... is generally not removable absent an independent ground of federal jurisdiction"). Thus, a plaintiff with an *in personam* maritime claim may choose to bring the claim in either state or federal court.

■ Cases such as *Romero* and *Coley*, however, only intended to prevent removal where the suit was based in general maritime law (in the absence of diversity jurisdiction). The language from these cases indicates that diversity jurisdiction is only one possible "independent basis for federal jurisdiction"; it does not limit removal where federal jurisdiction is established by statute. One of the leading authorities on admiralty law agrees that *Romero* should not be considered a bar to removal of cases based on "federal maritime legislation." T. Schoenbaum, *Admiralty and Maritime Law*, § 3–13, at 117–18 (1987).[8] Thus, this Court holds that in addi-

---

**7.** Counsel for Valcon intimates that the Agreement contains express provisions in support of the position that the United States reserves the rights to designate its own agents. However, as he notes, the United States has chosen not to submit such provisions.

**8.** Schoenbaum also notes that a minority of courts "have rejected this approach and have

tion to diversity jurisdiction, another "independent ground for federal jurisdiction" exists where specific federal statutes provide for a cause of action in federal court.

■ It is important to note that the requirement for a specific federal statute granting jurisdiction sufficiently protects the 'saving to suitors' option by allowing Congress to address the issue at the time of the passage of any such statute. For instance, in one of the most significant pieces of federal maritime legislation, the Jones Act, Congress specifically chose to protect the plaintiff's ability to choose a state or federal forum by appropriately worded pleadings. This indicates that Congress understands the tension between new federal statutory causes of action and a plaintiff's traditional ability to choose the forum under the saving to suitors clause. Indeed, in the case of the Jones Act, Congress chose to protect plaintiff's choice of a forum from "evisceration by removal" at the same time it created a new federal statutory basis for jurisdiction.

In this case, both the SAA, 46 U.S.C.App. § 741 *et seq.*, and the Public Vessels Act, 46 U.S.C.App. § 781 *et seq.*, provide an independent grounds for federal jurisdiction, but do not preserve the plaintiff's right to choose a forum. The SAA and the Public Vessels Act provide for a non-jury proceeding against the United States where a proceeding in admiralty could otherwise be maintained if the ship was privately owned. 46 U.S.C.App. § 742. No party contests that such a suit would be available on the facts of this case. However, plaintiff suggests that by refusing to name the United States or MTL, he has maintained his ability to proceed in state court by avoiding any federal question under the rule of the "well-pleaded complaint."

■ There may be instances where a plaintiff's choice of adversaries will preserve the choice of a forum, however, the Court need not consider that possibility in a case

held that even in a case involving a statutory claim, *Romero*'s strong policy against evisceration of the 'saving to suitors' clause prohibits removal absent diversity." T. Schoenbaum, *Admiralty and Maritime Law*, § 3–13, at 117–18 (1987).

such as this. When the SAA provides a remedy,

> it shall hereafter be exclusive of any other action by reason of the same subject matter against the agent or employee of the United States ... whose act or omission gave rise to the claim.

46 U.S.C.App. § 745. Thus, where the SAA provides a remedy, as it does here, this remedy is the exclusive remedy for the plaintiff against any employee or agent of the United States involved in the matter. The question turns, then, on the meaning ascribed by Congress to the words "agent or employee."

■ The case law clearly establishes that plaintiffs cannot escape the provisions of § 745 simply by refusing to plead their case against the United States. In the typical case, the plaintiff names as the defendant only the prime agent and not the United States. In those cases, plaintiff's complaint is dismissed pursuant to § 745 and plaintiff is required to bring the action against the United States. *See, e.g., Smith v. United States,* 346 F.2d 449 (4th Cir.), *cert. denied,* 382 U.S. 878, 86 S.Ct. 163, 15 L.Ed.2d 119 (1965); *Petition of United States,* 367 F.2d 505, 510 (3d Cir.1966), *cert. denied, Black v. United States,* 386 U.S. 932, 87 S.Ct. 953, 17 L.Ed.2d 805 (1967); *Landry v. United States,* 815 F.Supp. 1000 (E.D.Tex.1993); *Tarver v. United States,* 785 F.Supp. 607 (S.D.Miss. 1991). These and many other cases like them demonstrate that courts must look behind the face of the complaint to determine if the named defendant is within the "agent or employee" category protected by § 745.[9]

While these cases do not examine the application of § 745 to a *sub*contractor, the same principles should apply. The court must look behind the face of the complaint to determine if these subcontractors were the agents or employees of the United States. Plaintiff cannot avoid § 745 merely by refusing to name the proper defendant in his complaint.

9. In this case, the equivalent would have been if the plaintiff had named MTL and not the United States. All of the parties agree that MTL was the agent of the United States and that if plaintiff had named MTL, it would have violated the exclusivity provision of § 745.

When one considers the purpose of § 745, it is obvious that this is the only sensible rule. As the Fourth Circuit stated in *Smith*,

> The intent of [§ 745] was not to keep alive the liability of a private person, firm or corporation having charge of a Government ship. It was just to the contrary. It was the adoption of the exclusivity principle enunciated in *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 69 S.Ct. 1317 [93 L.Ed. 1692] (1949). Another purpose was to designate unequivocally the one to whom a claim for loss caused by the Government's ship should be directed, and to afford extra time for suit by those who had before erroneously proceeded against the contractor.

*Smith*, 346 F.2d at 453–54. To put the same principle into different words, one of the purposes of § 745 is to make sure that claims which may ultimately involve the United States are brought exclusively against the United States in federal court. Thus, courts must look behind the pleadings in such cases and ascertain whether the contractor being sued is actually an "agent or employee" of the United States. To hold otherwise would allow plaintiffs to defeat the Congressional intent of § 745 by artful pleading.[10]

### B. Are Subcontractors "Agents" For the Purposes of 46 U.S.C.App. § 745? [11]

Very few cases have explicitly considered the treatment of subcontractors under § 745. Defendants rely heavily on two cases from the Eastern District of Louisiana. *Bowman v. Pan American World Services, Inc.*, 704 F.Supp. 695 (E.D.La.1989); *Saffrhan v. Buck Steber, Inc.*, 433 F.Supp. 129 (E.D.La.1977). The facts of both those cases involved suits against subcontractors of a primary contractor of the United States. *Bowman*, 704

F.Supp. at 697. Both *Bowman* and *Saffrhan* found the subcontractor to be an agent of the United States for the purposes of § 745.

As restated by *Bowman*, one of the premises of the *Saffrhan* decision was that

> even if the subcontractor was not the operating agent of the U.S., the primary contractor was. Therefore, the primary contractor could not, by subcontracting part of its responsibilities, alter the rights and obligations either of the U.S. or of employees enjoying Jones Act status on a public vessel.

*Bowman*, 704 F.Supp. at 698. The *Bowman* court explicitly stated that if found *"nondispositive* the degree of the Government's control over the operations in question in determining agent status under § 745 of the [SAA]." *Id.* (emphasis added). Despite this adamant position, the *Bowman* court also ruled on the alternative ground of control, holding that the subcontractor was ultimately controlled by the United States because the subcontractor did its work pursuant to the terms of the original contract with the United States. *Id.*

Plaintiff relies heavily on *Nelsen v. Research Corp. of University of Hawaii*, 805 F.Supp. 837 (D.Haw.1992) for the proposition that mere ownership of the vessel by the United States is not sufficient to trigger the exclusivity provision of the SSA. The *Nelsen* court held that courts must use traditional agency principles in applying § 745. It held that the court must examine the agreement between the U.S. and the operator

> to determine to what extent, if any, (1) the government consented to allow [the operator] to act on its behalf and (2) [the operator] was subject to the government's control.

---

10. An interesting question remains whether the United States (or a contractor to the United States who subcontracted the work to another) could *contractually* avoid the effects of section 745. The *Smith* court explicitly refused to take up this question. 346 F.2d at 454. Because the parties did not argue this theory and because none of the submitted contract provisions indicate an attempt to do so, this Court will not consider this possibility either.

11. In their briefs and at argument, both the plaintiff and the United States argued that the state court was the proper forum for deciding the underlying issue of whether the subcontractors were agents for the purposes of the exclusivity provisions in the SAA. However, the United States has now changed its position, and the plaintiff concurs. Thus, all parties now agree that this Court is the proper forum for determining whether the subcontractors are agents for the purposes of the SAA.

*Nelsen,* 805 F.Supp. at 847. In examining the agreement at issue, the *Nelsen* court observed that the operator was required to maintain and repair the boat, to maintain liability insurance, and to hold the government harmless from third party claims. The government did not consent to allow the operator to act on its behalf. Nor was the boat operated for the benefit of the United States. Looking at these facts, the *Nelsen* court found that the operator was not an agent under the SSA and could be sued independently. *Id.*

Plaintiff may be correct in relying generally on the principle of agency, but the finer aspects of common-law agency principles do not govern in this instance. In the first place, the language of the statute itself prevents suit against the "agents *or* employees" of the United States. This disjunctive language indicates the Congressional intent to cover a wide-range of possible master-servant relationships within the purview of the exclusivity principle. Consequently, courts interpreting this language have not been overly concerned with the details of common-law agency relationships.[12] The Third Circuit, in an often-cited case on this issue, established that Congress intended a broad application of agency principles when interpreting § 745. In that case, noting that the operator in question was an "independent contractor" rather than a "servant," the Third Circuit went on to explain:

> an independent contractor, no less than a servant, may be an agent in that he is employed as a fiduciary, acting for a principal with the principal's consent and subject to the principal's overall control and direction in accomplishing some matter undertaken on the principal's behalf. Restatement, Agency, 2d § 14 N.

*Petition of the United States,* 367 F.2d at 509; *see also Smith,* 346 F.2d at 453 (the legal title or categorization of the relationship is not determinative of agency status).

In another frequently cited passage, the *Petition* court found evidence in the Congressional history for a broad interpretation. Asked for comment on the bill, the Department of Justice recommended that the "agent or employee" language be expanded to read "employee, agent, or instrumentality." Congress, however, stated that such language was an "immaterial variation" on the language in the bill. The *Petition* court found that "[t]his indicates that in the Congressional view the general statement of an agency concept as enacted included *any instrumentality through and by which public vessels are operated."* *Id.,* 367 F.2d at 510 (emphasis added). Finally, the court concluded that Congress intended to "make governmental liability exclusive throughout a broad spectrum of contractual arrangements for the operation of public vessels." *Id.* at 511. *See also Landry v. U.S.,* 815 F.Supp. 1000 (E.D.Tex.1993) (adopting *Petition* test); *LeBlanc v. United States,* 732 F.Supp. 709, 714 (E.D.Tex.1990); *Cruz v. Marine Transport Lines, Inc.,* 634 F.Supp. 107, 110 (D.N.J. 1986) (the focus should be on whether or not the party acted as a fiduciary to the government, undertaking to act on the United State's behalf, and whether it was subject to the control and direction of the United States), *aff'd without op.,* 806 F.2d 252 (3d Cir.1986), *cert. denied,* 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987).[13]

Applying these broad agency principles to the facts of this case reveals that defendants should obviously be considered agents of the United States for the purposes of § 745. In making this application, the Court must con-

---

**12.** Nor must there be consistency in interpreting these concepts in different statutes. *River & Offshore Serv. Co. v. United States,* 651 F.Supp. 276, 279 (E.D.La.1987) (there is no compelling reason why Tucker Act and the SAA must use an identical test for determining who is an agent of the United States).

**13.** The United States, in its brief, interprets the *Petition* test as a "litmus test" of whether the person or entity was retained "to manage, conduct the business of, and operate" a vessel of the

United States. The government explicitly notes that direct contractual privity is not required and that a subcontractor may be an agent for the purposes of § 745. Finally the government admits that MTL was certainly an agent of the government and that MTL was entrusted in its agreement with the United States to subcontract many of its duties in operating the ship. Despite all of these points, however, the United States still insists these subcontractors were not agents of the United States.

sider not only the terminology of the contract, but also the facts made a basis of this suit. All the parties agree that MTL is the general agent of the United States. Under their various subcontracts, all of the defendants named by plaintiff were performing work within the scope of the original Agreement. In fact, the Agreement specifically requires the Ship Manager to hire a subcontractor for much of the work on the fire suppression system that is at issue in this case.

In addition to these facts, the Agreement also gives the United States ultimate power over these contractors even if this power was not exercised as day-to-day operational control. The Agreement specifically reserves to the United States the right to terminate any subcontractor at any time. The United States may also require contractors to be bonded if deemed necessary.

Thus, though these subcontractors may have been independent contractors for some purposes, this does not mean they are not agents or employees of the United States for the purposes of § 745. These defendants were undertaking projects on behalf of the United States, and they were subject to the United States' approval and ultimate control and direction. Restatement (Second) of Agency, § 14 N.[14] The contractual arrangements were clearly an "instrumentality through and by which" a public vessel was operated, making the defendants agents or employees under the broad view of "agent or employee" adopted in *Petition of the United States,* 367 F.2d at 510.

### III. Conclusion

This Court finds that, at the time of the commission of the acts that are the basis of this suit, defendant subcontractors were agents or employees of the United States for the purposes of the Suits in Admiralty Act. Therefore, under the terms of 46 U.S.C.App. § 745, plaintiff's sole and exclusive remedy is against the United States in federal court.

Accordingly, plaintiff's motion to remand is DENIED. Because the Court has found that defendants were agents or employees for the purposes of the Suits in Admiralty Act, it must also GRANT all of the defendants' motions for summary judgment as to the plaintiff's complaint, but without prejudice as to the defendants' liability, if any, to the United States. Finally, because Norshipco's third party complaint against the United States is based largely on derivative liability of the United States under theories of contribution and indemnity, this Court must also DISMISS the third party complaint.

However, while this order would effectively terminate plaintiff's cause of action against these defendants, the Court recognizes that the likely result of this disposition is that plaintiff will exercise its exclusive remedy against the United States in federal court and that the United States will more than likely then sue for contribution against the some or all of the same defendants. Accordingly, in order to avoid any potential problems with the statute of limitations or other procedural problems, the Court GRANTS leave to plaintiff to amend her complaint to substitute the United States as the appropriate defendant. Any such amended complaint must be filed within thirty (30) days following the date of this order. Should such a complaint be filed, the United States shall then be given thirty (30) days thereafter to file its answer and any third party claims or any other claims against any of the original defendants named herein or against any other person, firm, or corporation.

The Clerk of the Court is DIRECTED to forward copies of this order to counsel for each of the parties including the United States.

IT IS SO ORDERED.

---

**14.** *See also* Restatement (Second) of Agency, § 5(1) which states

A subagent is a person appointed by an agent empowered to do so, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible.

This definition of a subagent fits well with the terms of the Agreement which requires the Ship Managers to exercise due diligence in the selection of contractors, and allows and even directs the Ship Manager to subcontract parts of the work of the Agreement.