54 F.3d 203
 1995 A.M.C. 2477
 Isabella SERVIS, Administratrix of the Estate of Peter
Thomas Humphrey, Plaintiff-Appellant,
v.
HILLER SYSTEMS INCORPORATED; Jason B. Nuss; Wayne Francis
Muth; Edward Speary, III, Defendants-Appellees.
NORFOLK SHIPBUILDING & DRYDOCK CORPORATION, Defendant &
Third Party Plaintiff-Appellee,
Valcon Sales and Services, Incorporated, Defendant,
v.
UNITED STATES of America, Third Party Defendant.
Michael G. Miller, Executor; Sadie R. Richardson,
Administratrix, c.t.a., of the Estate of William
B. Turek, Amici Curiae.
Isabella SERVIS, Administratrix of the Estate of Peter
Thomas Humphrey, Plaintiff,
v.
HILLER SYSTEMS INCORPORATED; Jason B. Nuss; Wayne Francis
Muth; Edward Speary, III, Defendants-Appellees.
NORFOLK SHIPBUILDING & DRYDOCK CORPORATION, Defendant &
Third Party Plaintiff-Appellee,
Sadie R. Richardson, Administratrix, c.t.a., of the Estate
of William B. Turek, Amicus Curiae,
and
Valcon Sales and Services, Incorporated, Defendant,
v.
UNITED STATES of America, Third Party Defendant-Appellant.
Michael G. Miller, Executor of the Estate of William B.
Turek, Amicus Curiae.
 Nos. 94-1979, 94-2103.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 4, 1995.
Decided May 16, 1995.
 
 ARGUED: Stephen Charles Swain, Clark & Stant, P.C., Virginia Beach, VA, for appellant Servis; David Vernon Hutchinson, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC, for appellant U.S. Peter Andreas Cotorceanu, Knicely & Cotorceanu, P.C., Williamsburg, VA, for amici curiae. Guilford D. Ware, Crenshaw, Ware & Martin, P.L.C., Norfolk, VA, for appellees. ON BRIEF: Frances W. Russell, Clark & Stant, P.C., Virginia Beach, VA, for appellant Servis; Frank W. Hunger, Asst. Atty. Gen., Helen F. Fahey, U.S. Atty. and Matthew A. Connelly, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC, for appellant U.S. James J. Knicely, Knicely & Cotorceanu, P.C., Williamsburg, VA, for amici curiae. James L. Chapman, IV, Martha M. Poindexter and Donald C. Schultz, Crenshaw, Ware & Martin, P.L.C., Norfolk, VA, for appellees.
 Before WIDENER and WILKINSON, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 Reversed and remanded by published opinion. Judge WILKINSON wrote the opinion, in which Judge WIDENER and Senior Judge CHAPMAN joined.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 Appellant Isabella Servis brought suit in Virginia state court against several contractors and subcontractors engaged to perform maintenance and repair tasks aboard a United States vessel, the M/V CAPE DIAMOND. Servis alleged that appellees' negligence resulted in the death of Peter Thomas Humphrey, who was working aboard the vessel. Appellees removed the action to federal district court, arguing that Servis' suit stated a claim under the Suits in Admiralty Act ("SAA"), 46 U.S.C. App. Secs. 741-752, and the Public Vessels Act ("PVA"), 46 U.S.C. App. Secs. 781-790. The district court agreed, holding that appellees should be considered agents of the United States for purposes of the SAA's "exclusivity provision," 46 U.S.C. App. Sec. 745, and that Servis' exclusive remedy was therefore against the United States in federal court. Servis v. Hiller Sys., Inc., 858 F.Supp. 590, 599-600 (E.D.Va.1994). We think the conclusion that appellees were "agents," however, overlooks general principles of agency law, the text of the statute itself, and the potentially vast liability such a reading could impose on the United States. Accordingly, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.
 
 I.
 A.
 
 2
 The United States owns the M/V CAPE DIAMOND, a "roll on/roll off" cargo ship, through the United States Maritime Administration ("MARAD"), an agency of the Department of Transportation. The CAPE DIAMOND is part of a fleet of vessels known as the Ready Reserve Force ("RRF"). MARAD bears primary responsibility for maintaining the RRF. In order to accomplish this objective, MARAD contracts with private companies to maintain and operate the vessels.
 
 
 3
 At the time of the accident underlying this litigation, the CAPE DIAMOND was being operated for MARAD under a "Ship Manager's Agreement" by Marine Transport Lines, Inc. ("MTL"), a private corporation. Under the Agreement, MTL was designated "Ship Manager" for the CAPE DIAMOND and other RRF vessels. The Agreement also referred to MTL as a "general agent" and described itself as a "general agency agreement." Pursuant to the Agreement, MTL consented to provide management, operational, and technical support for RRF vessels.
 
 
 4
 As Ship Manager, MTL engaged contractors to carry out certain of its responsibilities. The government agreed to reimburse MTL for the approved fees and expenses of such contractors. MTL in turn agreed to exercise due diligence in selecting contractors and to terminate any contractor not satisfactory to the government upon receiving written notification.
 
 
 5
 In May of 1992, MTL contracted with Norfolk Shipbuilding and Drydock Company ("Norshipco") to "deactivate" the CAPE DIAMOND.[1] In October, Norshipco in turn subcontracted some of the work on the CAPE DIAMOND to Hiller Systems, Inc. Specifically, Hiller was engaged to inspect the ship's carbon dioxide (CO sub2 ) fire suppression system. As part of a "condition report" later submitted to Norshipco, Hiller reported that there were leaks in the aft CO sub2 tank valve and recommended repair or replacement of the valve.
 
 
 6
 By purchase order dated December 3, 1992, Norshipco authorized Hiller to proceed with repairs to the CO sub2 system. On December 15, 1992, Hiller removed several valves, including the aft tank main shut-off valve, and sent them to Valcon Sales and Services, Inc. for inspection, testing, and repair. In late December, Valcon tested the valves and returned them to Hiller.[2] In early January 1993, Hiller employees reinstalled the valves.
 
 
 7
 On March 1, 1993, Michael Ford, a representative of MTL, hired Hiller to test the fire suppression system and certify it to the Coast Guard. The parties entered a separate agreement: rather than acting as a subcontractor to Norshipco, on this occasion Hiller was retained directly by MTL. Ultimately, MTL ratified Hiller's work on the fire suppression system via a confirmation purchase order.
 
 
 8
 The CAPE DIAMOND's fire suppression system was scheduled to be tested and certified on March 3, 1993. Hiller employees conducted the test, which requires a release of carbon dioxide in various areas of the ship to ensure that timing devices, system valves, dispersement nozzles, and alarms operate properly. The Hiller employees chose to test the system in the engine room first. They did not, however, order an evacuation of the engine room or otherwise ensure that no one was present in that area.
 
 
 9
 Hiller's employees planned to conduct a "puff test" by releasing a small amount of carbon dioxide into the engine room to activate the timing devices, system valves, and alarms. Because the aft tank main cut-off valve was not completely closed during the test, however, a massive amount of CO sub2 flooded the engine room. Humphrey, an electrical technician employed by a non-party to this suit, was working in the CAPE DIAMOND's engine room. Both Humphrey and a Coast Guard Marine Safety Inspector were asphyxiated by the CO sub2 released during the test.
 
 B.
 
 10
 As administratrix of Humphrey's estate, Servis filed suit in the Circuit Court for the City of Norfolk, naming as defendants Norshipco, Valcon, Hiller, and various Hiller employees. She alleged that the defendants were negligent in their performance of the CO sub2 test. The complaint did not, however, name the United States, MARAD, or the prime contractor, MTL.
 
 
 11
 In February, Norshipco removed the action to federal district court, contending that the SAA and PVA provide an exclusive federal forum for Servis' claims. Section 745 of the SAA, the "exclusivity provision," declares that "where a remedy is provided by [the SAA] it shall hereafter be exclusive of any other action by reason of the same subject matter against the agent or employee of the United States ... whose act or omission gave rise to the claim." 46 U.S.C. App. Sec. 745. The PVA incorporates the SAA's exclusivity provision. 46 U.S.C. App. Sec. 782.
 
 
 12
 Subsequent to removal, all defendants filed motions to dismiss, arguing that Servis' sole remedy was against the United States under Sec. 745. Servis in turn filed a motion to remand to state court based upon the "saving to suitors" clause of 28 U.S.C. Sec. 1333 and Romero v. International Terminal Operating Co., 358 U.S. 354, 371-72, 79 S.Ct. 468, 479-80, 3 L.Ed.2d 368 (1959). The district court determined that appellees were agents of the United States for purposes of the SAA's exclusivity provision. Servis, 858 F.Supp. at 599, 600. The court therefore denied Servis' motion to remand. Servis and the United States appeal.
 
 II.
 
 13
 Section 1333, the statute establishing the admiralty jurisdiction of the federal courts, provides in relevant part:
 
 
 14
 The district courts shall have original jurisdiction, exclusive of the courts of the States, of:
 
 
 15
 (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.
 
 
 16
 Section 1333's "saving to suitors" clause preserves a maritime suitor's election to pursue common-law remedies in state court. The Supreme Court has determined that such a claim brought pursuant to the saving to suitors clause in state court should not be removable on the ground of general federal question jurisdiction. See Romero, 358 U.S. at 371-72, 79 S.Ct. at 479-80. Admiralty and maritime cases may, however, be removable to federal court when there exists some independent basis for federal jurisdiction, such as diversity of citizenship, see, e.g., In re Dutile, 935 F.2d 61, 63 (5th Cir.1991), or when federal jurisdiction is independently established by a federal maritime statute. See Thomas J. Schoenbaum, Admiralty and Maritime Law, Sec. 3-13 at 117-18 (1987). The SAA or PVA would provide just such an independent basis for federal jurisdiction if they apply. Those statutes permit an action against the United States where the "act or omission" of an "agent or employee of the United States" gave rise to the claim. Williams v. Central Gulf Lines, 874 F.2d 1058, 1059-60 (5th Cir.1989), cert. denied, 493 U.S. 1045, 110 S.Ct. 843, 107 L.Ed.2d 837 (1990). Where the PVA or the SAA provides a remedy against the United States, there is no recourse against the government agent whose actions engendered the lawsuit. Manuel v. United States, 50 F.3d 1253, 1255 (4th Cir.1995); Buck Kreihs Co. v. International Marine Carriers, Inc., 741 F.Supp. 1249, 1250-51 (E.D.La.1990).
 
 
 17
 The question here, then, turns on the definition of "agent" under Sec. 745. If in fact appellees are agents of the United States, the SAA declares that the sole remedy for Servis' claims is an action against the United States in federal court. By contrast, if appellees are not agents of the United States, then Servis' action may go forward against appellees in state court under the "saving to suitors" clause of Sec. 1333.
 
 III.
 
 18
 Appellees contend that they are "agents" of the United States within the meaning of Sec. 745 and thus enjoy the immunity from suit conferred by that section. They reason that they were engaged to perform various tasks entrusted to MTL by the Ship Manager's Agreement and that the United States retained ultimate control over their performance of those tasks. In addition, appellees insist that Petition of United States, 367 F.2d 505, 510-11 (3d Cir.1966), cert. denied sub nom. Allen v. Mathiasen's Tanker Indus., Inc., 386 U.S. 932, 87 S.Ct. 957, 17 L.Ed.2d 805 (1967), indicated that the term "agent" should be interpreted expansively for purposes of the exclusivity provision. We do not find this reasoning persuasive.
 
 A.
 
 19
 To begin with, appellees' argument conflicts with basic principles of agency law that must guide our interpretation of the statutory term "agent." See Nelsen v. Research Corp. of Univ. of Hawaii, 805 F.Supp. 837, 847 (D.Haw.1992) ("use of general agency language in Sec. 745 indicates that Congress intended that the traditional concept of agency should govern its application"). Restatement (Second) of Agency Sec. 1(1) provides that an agency relationship is "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." According to the Restatement definition, appellees were in no sense "agents" of the United States when they were hired to perform limited repair tasks aboard the CAPE DIAMOND.
 
 
 20
 Appellees in fact were not even parties to the Ship Manager's Agreement between MARAD and MTL. To the contrary, Norshipco performed work under the terms of a ship repair contract issued by MTL, Hiller performed work under the terms of purchase orders executed by MTL and Norshipco, and Valcon performed work under the terms of a valve repair contract issued by Hiller. None of these documents evidences any intent on the part of the United States to enter into a fiduciary relationship with Norshipco, Valcon, or Hiller, nor do the documents indicate that appellees consented to act as fiduciaries of the government. None of the documents refer to any appellee as an "agent" of the United States. Cf. Nelsen, 805 F.Supp. at 847 (bareboat charter agreement between United States Navy and putative agent is "primary piece of evidence as to the agency relationship between" Navy and plaintiff's employer).
 
 
 21
 MTL, by contrast, was expressly engaged to serve as the United States' general or operating agent for the CAPE DIAMOND and was in fact the only party to consent to agency status with the United States in the Ship Manager's Agreement. The fact that the Ship Manager's Agreement contemplated that MTL would subcontract the performance of discrete tasks (including the testing and repair of the CO sub2 system) does not signify that the United States authorized any such subcontractors to act on its behalf as agents. MTL could (and indeed had to) subcontract certain repair and maintenance duties, but it was not authorized to delegate any of its management or operational responsibilities to a third party. Thus, appellees cannot qualify as subagents of the United States. See Restatement (Second) of Agency Sec. 5(1). The Agreement authorized MTL, and MTL alone, to manage and conduct the business of the CAPE DIAMOND. Cf., e.g., Doyle v. Bethlehem Steel Corp., 504 F.2d 911, 912 (5th Cir.1974) (company "engaged to manage and conduct the business of the Government with respect to the operation of certain Navy tankers" was agent of the United States under Sec. 745); Buck Kreihs, 741 F.Supp. at 1251 (generally, "contract operator" of naval vessel is considered agent of the United States for purposes of Sec. 745).
 
 
 22
 In light of these facts, it is evident that appellees were merely non-agent independent contractors of the United States. Restatement (Second) of Agency Sec. 14N, cmt. b, defines a non-agent independent contractor as "[a] person who contracts to accomplish something for another or to deliver something to another, but who is not acting as a fiduciary for the other." The term, the Restatement notes, "is used colloquially to describe builders and others who have contracted to accomplish physical results not under the supervision of the one who has employed them to produce the results." Id. We think it apparent that appellees' contractual relationship with the United States falls squarely within this definition.
 
 B.
 
 23
 For purposes of the SAA, a primary factor in determining agency status is the degree of operational control exercised by the United States. See, e.g., Trautman v. Buck Steber, Inc., 693 F.2d 440, 445 (5th Cir.1982) (reasoning that degree of United States' operational control determines agency status under the Jones Act); Nelsen, 805 F.Supp. at 847. In the instant case, the United States exercised no operational control over appellees' day-to-day performance of their contractual duties. At most, the Ship Manager's Agreement permitted the United States to approve contractors' bills and to direct MTL to terminate a contractor or subcontractor:
 
 
 24
 Contractors. The Ship Manager shall exercise due diligence in the selection of contractors. The fees and expenses of contractors utilized to aid in the performance of services and functions required herein on such terms and for such periods of time as the Ship Manager deems necessary, and are approved by the Government, shall be included in the costs to be reimbursed by MARAD. The Ship Manager shall promptly terminate any contractor not satisfactory to the Government upon written instructions from the Contracting Officer or his designated representative. The use of contractors shall be subject to a bonding requirement if determined by the Contracting Officer.
 
 
 25
 Ship Manager's Agreement Section C-5.4, p 5.4.1.31.
 
 
 26
 This provision in no sense granted the United States "control" over the physical performance of appellees' contractual duties. Nor did any of the contracts under which appellees performed the various repair and maintenance tasks cede control over their efforts to the United States. In the absence of such operational control by the government, we cannot agree with the district court that the limited oversight the United States did retain in the Ship Manager's Agreement was adequate to render appellees its agents. Cf. Williams v. United States, 50 F.3d 299, 306 (4th Cir.1995) (noting that United States is not liable under Federal Tort Claims Act, 28 U.S.C. Secs. 1346(b), 2671-2680, by virtue of entering contracts and demanding compliance with federal standards in absence of actual supervision over "day-to-day operations" of contractor's work); Leone v. United States, 910 F.2d 46, 50 (2d Cir.1990) (finding no governmental liability under Federal Tort Claims Act, although United States "act[ed] generally as an overseer," when United States did not manage details nor supervise daily activities of alleged tortfeasors), cert. denied, 499 U.S. 905, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991).
 
 C.
 
 27
 Finally, in determining the scope of the statutory term "agent" under the SAA, we must refer to the entirety of Sec. 745's text. A proviso to Sec. 745, enacted concurrently with the exclusivity provision, permitted a one-time waiver of the statute of limitations in cases in which a plaintiff had erroneously brought suit against an "agent"--that is, against "any person, partnership, association, or corporation engaged by the United States to manage and conduct the business of a vessel owned or bareboat chartered by the United States or against the master of any such vessel." 46 U.S.C. App. Sec. 745.
 
 
 28
 The exclusivity clause and this proviso must be read in pari materia. Petition, 367 F.2d at 510; Nelsen v. Research Corp. of Univ. of Hawaii, 752 F.Supp. 350, 356 (D.Haw.1990). Hence, it can reasonably be concluded that the term "agent" as used in the exclusivity provision is synonymous with one who is "engaged by" the United States "to manage and conduct the business of" a government vessel. None of the appellees herein were engaged "to manage and conduct the business of" the CAPE DIAMOND and thus, under the terms of the statutory definition, none were agents of the United States.
 
 IV.
 
 29
 In the absence of a clear signal from Congress that it intended to subject the United States to broad-ranging liability, we decline to hold that contractors or subcontractors such as appellees are "agents" within the meaning of the SAA. To do otherwise, the government notes, raises the specter of governmental liability for every act of negligence by a painter or plumber engaged to perform some limited task aboard a United States vessel, regardless of that party's contractual relationship with the government. Indeed, because the SAA waives the government's sovereign immunity, that statute must be strictly construed in favor of the United States. See, e.g., McMahon v. United States, 342 U.S. 25, 27, 72 S.Ct. 17, 19, 96 L.Ed. 26 (1951). Such a construction requires that the term "agent" be read to exclude governmental liability for the negligence of independent contractors who are engaged to perform limited tasks aboard government vessels and who are not subject to the United States' operational control.
 
 V.
 
 30
 For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.
 
 
 31
 REVERSED AND REMANDED.
 
 
 
 [1]
 In November of that year, a decision was made to put the CAPE DIAMOND on "reduced operating status" rather than deactivate the vessel. Accordingly, a new contract between MTL and Norshipco apparently replaced the preexisting agreement
 
 
 [2]
 Valcon insists that it did not inspect the particular valve at issue in this case. As the district court noted, however, resolution of this factual dispute is not material to the question before us--namely, the interpretation of the term "agent" in the SAA